## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                              No. 2:20-CR-20148-SHL-tmp

KATRINA ROBINSON

      Defendant.

---

**DEFENDANT'S CONSOLIDATED MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL WITH AN INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

---

Katrina Robinson, by and through her counsel, respectfully submits this Consolidated Motion for Judgment of Acquittal and Motion for New Trial with an Incorporated Memorandum of Law in Support:

## INTRODUCTION

The Government created a mess in this case when they over-reached and charged Ms. Robinson with crimes, which they simply could not prove. The Court was forced to strike days of testimony, and the Government, then, facing a likely acquittal on almost all of the counts, shifted their theory and allegations in contravention of the Fifth Amendment. This prejudicial shift in factual and legal theories away from what was charged in the indictment prevented a fair trial. The Court should grant Judgment of Acquittal under Rule 29 on Counts 11, 12, 19, and 20. No rational jury could have found Ms. Robinson guilty of those counts based on the allegations presented to the grand jury and returned in the Second Superseding Indictment. To the extent the Government amended that indictment in violation of the Fifth Amendment, the Court should not consider the

new allegations and evidence unrelated to the allegations made in the Second Superseding Indictment. However, even if the Court examines the Government's new allegations and amended indictment, Ms. Robinson is still entitled to acquittal based on the Government's failure to offer proof on multiple essential elements of wire fraud in Counts 11, 12, 19, and 20.

If the Court is unwilling to grant Ms. Robinson an acquittal, the Court should grant her a new trial. The Government, admittedly, violated the Fifth Amendment and argued a theory that was neither presented to the grand jury nor included in the Second Superseding Indictment. Furthermore, even if the Court is willing to allow the Government to proceed in violation of the Fifth Amendment, the Court should still grant Ms. Robinson a new trial, as the weight of the evidence in this case preponderates heavily against the jury's verdict on Counts 11, 12, 19, and 20. Here, justice requires, at a minimum, a new trial for Ms. Robinson.

## BACKGROUND

On August 17, 2021, the Government went to a grand jury and presented the Second Superseding Indictment. In the Second Superseding Indictment, the Government alleged a $600,000 scheme to defraud involving theft or misapplication of grant funds and numerous wires in furtherance of that alleged scheme. (*Second Superseding Indictment*, ECF 107.)

### *Pretrial Background*

Throughout the history of this case, the Government has made it clear that it alleged and intended to prove that (1) Katrina Robinson perpetrated a scheme to steal or misapply grant funds, and (2) she used wires in furtherance of that scheme.[1] The Court explicitly recognized that this was the Government's theory:

---

[1] *See, e.g.*, Second Superseding Indictment; Response of the United States to Defendant's Motion to Dismiss Count 1, Count 21, and Count 22, ECF 53, at 11 ("[T]he allegations against Robinson in this case—namely stealing large amounts of federal grant money for a four-year period—evidence a far greater level of intent to defraud than the conduct at issue in" other cases.); Response of the United States to Defendant's Motion to Dismiss Counts 3 and 4 or, in the Alternative, to Strike from the Respective Expenditures that Are Salaries, Bonuses, and Other Compensation,

> Counts 3 and 4 of the Superseding Indictment, (ECF No. 64), allege that Defendant Katrina Robinson misappropriated grant funds obtained from the Health Resources and Services (HRSA), or that she paid herself compensation in excess of the maximum compensation allowed for grant recipients.
>
> Specifically, Count 3 alleges that Ms. Robinson impermissibly spent $295,970.98 of HRSA grant funds between July 1, 2017 and June 30, 2018. . . .
>
> Count 4 alleges that Ms. Robinson impermissibly spent $164,669.32 of HRSA grant funds between July 1, 2018 and June 30, 2019.

(Order Denying Defendant's Motion to Dismiss or, in the Alternative, Strike Counts 3 and 4, ECF 96, at 1-2.[2])

On the eve of trial, the Government filed a Motion in Limine to prevent Ms. Robinson from arguing that she was authorized to make certain expenditures based on her status as a sole member and later sole shareholder of The Healthcare Institute ("THI").  (Motion in Limine, ECF 104.)  At hearing on the Motion in Limine, the Court stated to the Defendant that the Government was not arguing a corporate formalities or business-versus-personal theory.  Based on this understanding of the Government's theory, the Court ultimately granted the motion.  Not entirely satisfied with the Government's theory of prosecution, however, the Court ordered the Government to file a memorandum explaining the theory of prosecution.

The Government filed a Pretrial Memorandum on Applicable Rules, Regulations, and Policies, ECF 117, on August 30, 2021, two and a half weeks before trial.  The Government explained its theory:

> The federal grant to The Healthcare Institute (THI) in this case was awarded under the Geriatrics Workforce Enhancement Program (GWAP) (sic).  This grant program was established by statute at 42 U.S.C. § 294c to "support the training of health professionals in geriatrics, including trainees or fellowships."  As set forth

ECF 84, at 9 ("Specifically, in Counts 3 and 4, Robinson was charged with being compensated with 'salary in excess of amounts permitted under [] grant terms.'  It is this excess salary and compensation, along with the unauthorized performance bonus, that was not bona fide and not in the usual course of business, and not Robinson's regular salary.").

[2] The Court also wrote, "The Government, however, responds that the grant included terms limiting salary, and Ms. Robinson's compensation was in excess of those terms."  (*Id.* at 5.)  The Court even noted that "[o]nly the excess [of] salary [allowed under the grant] is listed in the indictment, after excluding the legal maximum salary.  Thus, the Government contends that no part of the amount listed in the indictment is bona fide salary." (*Id.* at 5.)

below, recipient's use of grant funds under this program are governed by an interconnected set of terms in the grant itself, Dept. of Health and Human Services (HHS) policies governing all of its grants, and federal regulations.

(*Id.* at 1.)  The Government then went into exhaustive detail into the various ways that ***grant funds*** were governed by those items*.  (See generally id.*)

### Government's Case-in-Chief

At trial, the Government continued to argue that (1) Katrina Robinson had a scheme to steal or misapply grant funds (Counts 1-4 and Counts 18-20, which included the alleged misrepresentations at issue), and (2) she used various wires in furtherance of that scheme (Counts 5-17 for the various expenditures allegedly made with grant funds and Counts 18-20, the wires containing the alleged misrepresentations).  The Government argued their case this way during opening statements and throughout the testimony of their witnesses.[3]

First, the Government presented testimony from Nina Tumosa to explain the grant, the application, and the various communications between HRSA and THI.  Dr. Tumosa first explained that THI submitted a grant application in March 2015, where THI indicated that HRSA would pay $900 towards the tuition of certain students who qualified under the terms outlined by THI in the grant application.  (*See*, ECF 144, *Testimony of Nina Tumosa and Bruce Holmes*, at 8-11; *see also* Trial Exhibit 1.)  Next, Dr. Tumosa explained that successful grantees would receive a Notice of Award (NOA), which contained: "an approved budget", "terms and conditions", "several types of terms and conditions", and "reporting requirements that are needed in order for HRSA to monitor the grant spending—the grant progress and the grant spending." (Testimony of Nina Tumosa and Bruce Holmes, ECF 144, at 11-12; *see also* Trial Exhibit 2.)

---

[3] Ms. Robinson will attempt to limit the evidence discussed to only that evidence that was ultimately not stricken from the record after the Court granted Judgment of Acquittal on many of the counts in the Second Superseding Indictment.

On each of the Notices of Award, the grantee was awarded a certain amount of tuition and fees for students in that year.  In 2015-2016, THI was awarded $90,380.00, approximately 100 scholarships.  (Trial Exhibit 2, Bates 8527).  In 2016-2017, THI was awarded $111,775.00, approximately 125 scholarships.  (*Id.* at Bates 8538; *see also* Bates 8550 (showing the same amount for tuition and fees even with carryover money).)  In 2017-2018, THI was awarded $90,521.00, approximately 100 scholarships.  (*Id.* at Bates 8544; *see also* Bates 8552 (showing the same amount for tuition and fees even with carryover money).)  In 2018-2019, THI was awarded $90,521.00, approximately 100 scholarships.  (*Id.* at Bates 8533; *see also* Bates 8554 (showing the same amount for tuition and fees even with carryover money).)

Next, Dr. Tumosa explained the Annual Performance Reports (APRs), which contain all of the Government's alleged misrepresentations[4]:

> It is the mechanism—it is an annual report, as its name says, where—that is due at the end of each year of funding that describes a variety of things about this—that allows the project officer to determine whether the project director was successful in meeting her—the stated goals.
>
> So it contains information about how many students were trained, what their demographics were, male, female, what age they, what racial background did they have, what is their financial—are they underserved populations, are they—what are other things would be in there.  Basically demographics and also what profession they would be in.
>
> . . .
>
> [T]he idea is that, in general, they need to report to Congress how many people were trained, how many hours they were trained, what their professions were, that sort of thing.
>
> . . .
>
> Yes, they were [required to report the number of students who received grant-funded scholarships in their APR reports].

(Testimony of Nina Tumosa and Bruce Holmes, ECF 144, at 14-15.)  Dr. Tumosa continued discussing the APRs and the required information:

---

[4] *See* Second Superseding Indictment, ECF 107, at ¶ 8, *see also* Amended and Supplemented Bill of Particulars, ECF 111.

> Any student that is trained that received funding from the grant, all of that information is required. Plus, they are given—they are to be given a unique identifier number, which is seven numbers or letters long, and that is the way in which they are identified to HRSA
>
>  HRSA does not request the names of these individuals. That is considered to be private information, and the Federal Government does not request it. But it does request that the school maintain a list so that that list does match those unique identified numbers with the names of those students.
>
> . . .
>
> The annual report performance data is really crucial to HRSA's—because they have reports that are required to Congress. And they need to report how many—whether they have—they need to report whether the purposes of each of its programs have been met.

(*Id.* at 27-28.) Finally, Dr. Tumosa explained that the "filing of the Annual Performance Report is a requirement . . . to be funded continuously" and "is used to evaluate future funding." (*Id.* at 28.)

On cross examination, Dr. Tumosa made several statements that are also relevant. First, she explained that "ADRD is acronym for Alzheimer's Disease and Related Dementias." (*Id.* at 55.) On cross examination, Dr. Tumosa also explained the timeline of awards and reports and that the noncompeting continuation (NCC) progress reports, which are submitted in March or April,[5] are used to evaluate whether a grantee will be "recommend[ed]" for continued funding and ultimately granted that funding. (*Id.* at 74-78.) She also testified explicitly that grantees were not supposed to use social security numbers or any other number that could be directly traced to a particular student. (*Id.* at 109, 111.) Dr. Tumosa also testified about issues involving the system where the APRs were uploaded in 2019, including complaints from Ieshia Wesley, a THI employee. (*Id.* at 112-13, 116; *see also* Trial Exhibit 8.) Dr. Tumosa also testified that there were issues related to the system in 2018 for submitting APRs. (*Id.* at 123-24.)

On re-direct, Dr. Tumosa testified about the NCC reports versus the APRs:

---

[5] The APRs, on the other hand, were submitted after funding had been received for that year's report and after funding had been awarded for the next year. (*Id.* at 81.)

6

Yes. I think I mentioned earlier that the two reports, the NCC report, the noncompeting continuation report, which is the one that is due just before the end of each year, is what my bureau where I work and I, as a project officer, and my superiors, we rely very heavily upon that report as to whether we feel that's the proper -- not only is proper progress being made, but are there any barriers that we should address to make it possible for our grantees to succeed.

We have made an investment. We want that investment to work. We want to make sure that we do everything that we can to make that program succeed. So it is there where my program itself says we are or we are not satisfied with progress.

The next report, the one  that is—is—with all the tables in it where you fill in all those numbers, that is primarily used by HRSA to compare the different programs and to combine reports to show to Congress whether or not as a—in general, education and training of the healthcare workforce is worthwhile and a good thing to do.

(*Id.* at 136-37.)

The Government then called Bruce Holmes to address what was and was not allowed to be spent under the grant.  As relevant, he testified that it was not permissible to use grant funds to pay for an individual's wedding.   (*Id.* at 174-75.)

The Government offered proof from Ms. Chaffen (Facegyrl), including a Wedding Invoice. (Trial Exhibit 28.)  The Government offered various records relevant to Agent Richard Haines testimony.  (*See, e.g.*, Trial Exs. 30-31 WIN Records.)  The Government also offered records from GP Entertainment/Pittstop Tapas and Catering.  (Trial Ex. 47.)  Victoria Howell testified about the bank records that showed that the purchases contained in Counts 11 and 12 were made from the THI Operating Account at Regions: (11) 06/03/2016, GP Entertainment, $2,326.01, payment to performing artist booking agency and (12) 06/21/2016, Facegyrl, $1,158.05, payment to wedding makeup artist.  (Second Superseding Indictment, ECF 107, at 16.)  Ms. Howell's chart shows that there were no grant funds deposited into the account in June of 2016, the month of both wedding

expenditures.  (Trial Ex. 62.)  The June 2016 Regions statement[6] shows a beginning balance of $39,511.82.  (Trial Ex. 18, Bates 1778.)

The Government also called a witness from HRSA OIT to testify about the IT records.  The IT records entered into evidence do not show who submitted the APR reports, but they do show that Ieshia Wesley did not get a login until August 8, 2018, the day the Count 19 APR was submitted.  (Trial Ex. 70.)   Ms. Wesley took the stand and testified that she was the person who entered the data into the APRs for 2017-2018 and 2018-2019.  She also testified that completing the report was tedious and required her to look in multiple places to obtain the information to complete the report, and she further testified that Katrina Robinson never told her to falsify data in the APRs.

Next, Agent Richard Haines testified.  As relevant, he testified that, for Count 19, there was no name associated with the ID number for most of the ID numbers listed on the APR, based on the mistaken belief that the ID numbers were required to be social security numbers.[7]  He also testified that in 2017-2018, he found evidence of paperwork for only 161 students receiving HRSA scholarships, yet 201 scholarships were claimed on the report.  Overall, 234 students were reported on the APR while he found evidence for 250 students that attended THI.  For Count 20, Agent Haines testified that he found 11 issues with THI claiming HRSA scholarships on the 2018-2019 APR, and he also found no name associated with 31 ID numbers.  His charts are admitted as Trial Exhibit 73.

On cross examination, Agent Haines testified that he found no evidence that Katrina Robinson ever told any of her employees to falsify data on the APRs.  (Cross Examination of

---

[6] Defendant does not believe that Ms. Howell testified to this specific bank statement, but the Government drew the jury's attention to it during closing argument.
[7] The Court can look to the testimony of Nina Tumosa, *supra* at 6, and the actual instructions for the APR (Trial Ex. 75), to show how this was a mistake on his part.

Richard Haines, ECF 156, at 4-6.)  He admitted that he did not actually look at the THI financial records to determine the number of scholarships that were actually awarded by THI, and he stated that he "was not involved in the financial side of the investigation."  (*Id.* at 15-16, 34.)  He testified that APRs have no direct tie to funding, admitting further that each APR is submitted after funding has been received for that year and after funding has been awarded for the next year.  (*Id.* at 15-16.)  He admitted that THI received funding for 100 students in 2017-2018 under the NOA,[8] and he testified that he found scholarship paperwork for 161 students.  (*Id.* at 22.)  He also testified that although the APR only listed 234 ID numbers, he actually found 250 students who attended THI that year.  (*Id.* at 61.)

For the ID number issue, he stated that he never reviewed the APR instructions but would not be surprised if Nina Tumosa testified that grantees were not supposed to use social security numbers.  (*Id.* at 56-57.)  He also testified that he did not know if there was a list somewhere to show what the ID numbers represented: "I have no idea."  (*Id.* at 61.)

Richard Haines further testified that, in 2018-2019, THI received funding for 100 scholarship students based on all of the NOAs introduced by the Government.  (*Id.* at 25.)  He testified that he had no doubt in his mind that Katrina Robinson had the proper scholarship paperwork for 100 students.  (*Id.*)  Agent Haines also admitted that he made many mistakes in his initial analysis and what he presented to the grand jury, including numerous mistakes related to Count 20.  (*See generally id.*; *see also id.* at 69-70.)

Courtney McNeal, a former THI employee, testified that she was never asked to intentionally inflate numbers or otherwise make misrepresentations by Katrina Robinson.

---

[8] Agent Haines tried to discuss carryforward money, but all of the NOAs, including those that included the carryforward awards, listed the same amount for tuition and fees.  *See supra* at 5.

Finally, the Government called Jonathan Nyaku.[9]  Nyaku testified to the only piece of evidence that allowed the Government to survive Judgment of Acquittal on Counts 11 and 12: the July 25-26, 2016 emails between Phylea Foster and Katrina Robinson regarding categorization of five expenses.  (Trial Ex. 83.)  The Government, however, failed to show Nyaku the full email with the classifications, and, in so doing, the Government presented an incomplete and somewhat misleading picture of the significance of Trial Exhibit 83.  Nyaku also established that, for accounting purposes, THI had two different buckets: GOV for the grant expenses and income and THI for non-grant expenses and income.  (*See* Trial Exs. 88-91, 93-98.)  He testified to numerous alleged improper grant expenditures being put under the THI category, effectively destroying the government's theory on most counts.  He also testified to the large profits and equity that THI had earned, and he offered undisputed testimony that Katrina Robinson was entitled to those profits. (*See* Trial Exs. 95-98.)

### Judgment of Acquittal

Based on the Government's inability to show that most of the alleged purchases were made with grant funds, the Court dismissed Counts 1-17, except 11 and 12, and struck days' worth of testimony regarding *legal* expenditures made by Ms. Robinson.  The Court allowed the Government to continue on their original theory for Counts 11 and 12—that these two wedding expenses were wrongfully made with grant funds.  The Court based this decision on Trial Exhibit 83.  Although the Court found that two of the expenses contained in Count 1 could have possibly involved grant funds, the Court dismissed Count 1 because the two expenses did not reach the statutory monetary threshold for § 666 offenses.[10]  The Court specifically ruled and questioned the

---

[9] The Government called several former THI students, but all of those students were from Count 18.
[10] The Government also mischarged the GP Entertainment expenditure in Count 1.

Government to ensure that they still intended to argue that Ms. Robinson stole or misapplied grant funds for Counts 11 and 12.

With Ms. Robinson completely successful on the motion for judgment of acquittal in grant years 2016-2017 (Count 2), 2017-2018 (Count 3), amd 2018-2019 (Count 4), the Government no longer had an argument for continuing on with Counts 18, 19, or 20 under the Second Superseding Indictment, which alleged a $600,000 scheme to steal or misapply grant funds while making intentional misrepresentations to HRSA about (a) failing to report changes regarding salary and compensation for Ms. Robinson and operational changes for THI, (b) claiming non-graduates as graduates, (c) representing to HRSA that certain individuals received scholarships, and (d) representing to HRSA that certain student identification numbers were connected to students. (Second Superseding Indictment, ECF 107, at ¶ 8.)

Over the objection of the Defendant, the Court allowed the Government to effectively amend the Second Superseding Indictment and change its theory of prosecution for Counts 18, 19, and 20, and allege, for the first time, that Counts 18, 19, & 20 were actually part of a different scheme to simply continue getting grant funds (Counts 18 and 19) and a different scheme to make sure grant funds were not clawed back after the grant ended (Count 20).

***Defendant's Proof***

Chelsey Cox and Shani Wilhite both testified to the difficulties with completing the APRs and that Katrina Robinson never told either of them (or anyone as far as they are aware) to falsify any information on the APRs.

Katrina Robinson responded to all of the allegations against her by stating definitively that she did not commit any of the crimes alleged.  She made no material or intentional misrepresentations, and there simply was no scheme to defraud.  The Court need not weigh her

11

testimony, however, as the evidence, even without considering Ms. Robinson's testimony, shows that Ms. Robinson is entitled to Judgment of Acquittal or a New Trial.

First, consider the APR Instruction Manual. (Trial Ex. 75.)  Even though the main thrust of Richard Haines' testimony on Count 19 was that the ID numbers on the APRs could not be matched to the Social Security numbers of THI students, Exhibit 75 (in addition to Dr. Tumosa's testimony) shows that THI was not supposed to use social security numbers on the APRs. (*Id.* at page 206-207.)

The APRs themselves also offer important proof, as they show that the number of scholarship recipients was not even a part of the summary tables that were listed at the beginning; instead, those summaries only contain demographic data for all students regardless of scholarship status.  (Trial Ex. 3.)  Thus, in order to check the number of scholarships claimed, someone would have had to go line-by-line through numerous rows and columns on the APRs.

Meanwhile, on Counts 11 and 12, Trial Exhibit 102 shows that cash was deposited into the Regions account, including a $3,400 cash deposit, almost the exact combined amount of the expenditures in Counts 11 and 12, soon after the expenses (and before the emails in Exhibit 83). Trial Exhibit 102 also shows thousands of dollars in cash were deposited in the months leading up to the wedding.

Meanwhile, Exhibit 83, which was the only piece of evidence that allowed the Government to survive Judgment of Acquittal on Counts 11 and 12, actually shows that the "classifications" listed next to the various expenditures by Ms. Robinson were NOT grant classifications:

- 6/3/2016- Card Purchase Sq *gp Entertai- $2,326.01 - Event Package including rentals and Branded giveaways
- 6/20/2016- Card Purchase The Life Church- $150.00 - Charitable Contribution
- 6/21/2016- Card Purchase White Door Even- $497.09 - Equipment Rental
- 6/21/2016- Card Purchase Sq *facegyrl Br- $1,158.05 - Professional Services
- 6/23/2016- Google *wallet- $796.00 - Food/Setup

12

(Trial Ex. 83.)  Compare those classifications to the expenditure categories listed on Exhibit 94, which was entered during the testimony of Mr. Nyaku and his explanation of the two buckets: GOV for HRSA grant and THI for non-grants.  Exhibit 94 clearly shows that these "classifications" were not GOV categories, and, in fact, they fit quite neatly into THI categories (*i.e.*, non-grant categories).  (Trial Ex. 94 at 4.)  Event Package and Food/Setup were not GOV categories, but they do fit squarely in "THI-Meals and entertainment."  (*Id.*)  Next, there is no charitable contributions category under the grant, but there is a "THI-Charitable contributions" category. While there is no "Professional Services" category under the grant, there is a "THI-Professional fees" category.  Finally, there is no equipment rental category under the grant, but, again, there is a "THI-Equipment rental" category.  As such, the evidence shows quite clearly that these expenditures were not put under the grant.

The $497.09 charge for equipment rental is quite significant in showing how the Government failed to prove its theory of prosecution.  The Government alleges that Katrina Robinson told the accountant that she should put all of the above expenses under the grant, but the evidence clearly shows that this specific charge was unquestionably NOT put under the grant. Exhibit 94 shows that, for the entire year, there was $1,**497.09** for "THI-Equipment rental."  (*Id.*) Thus, it is clear that the $497.09 was part of this category and is included in the **non-grant** expenditures.  As such, the actual evidence clearly shows that these five expenses (including those in Counts 11 and 12) were not charged to the grant.

*Jury Instructions-*

The Court instructed the jury on the law of wire fraud.  As relevant, the Government first had to prove Ms. Robinson "knowingly participated in, devised, or intended to devise a scheme to defraud in order to deprive another of money or property."  (Jury Instructions, ECF 160, at 27.)

When asked if they wanted to include a description of the scheme in the jury instruction, as is the typical practice, *see* 6th Circuit Pattern Instruction 10.01(1)(A), the Government could no longer describe the scheme and asked the Court not to include a description.  Ms. Robinson objected at the time and is still left wondering what scheme she was convicted of allegedly devising.

The Court also instructed the jury that they had to find "that the scheme included a material misrepresentation or concealment of a material fact."  (Jury Instructions, ECF 160, at 27.)  Next, the Court explained that the Government had to prove that Ms. Robinson "had the intent to defraud,"  which "means to act with an intent to deceive or cheat for the purpose of depriving another of money or property."  (*Id.* at 27, 29)  Finally, the Government had to prove that Ms. Robinson "used wire . . . or caused another to use wire . . . communications in interstate commerce in furtherance of the scheme."  (*Id.* at 27)

Finally, the Court explained that the Government had the burden to prove that Ms. Robinson did not act with good faith.  Specifically, the Court explained,

> A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out be inaccurate, incorrect, or wrong.  An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct.

(*Id.* at 31-32.)

## LAW

The following legal issues and standards are relevant to the Court's decision in this matter.

### *Presentment*

Under the Fifth Amendment, the Government was required to present their indictment to a grand jury.  *Id.*  There is little doubt, as the Court has previously indicated on multiple occasions, that the Government argued something that was not presented to the grand jury.  A review of the

allegations in the Second Superseding Indictment and the procedural history in this case makes that clear. "An amendment is considered *per se* prejudicial." *United States v. Robison*, 904 F.2d 365, 369 (6th Cir. 1990). "An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them." *Id.* (quoting *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989)). The Government's own guidance from the Department of Justice reads:

> If the indictment could be changed by the court or by the prosecutor, then it would no longer be the indictment returned by the grand jury. Indeed, in *Russell v. United States*, 369 U.S. 749, 769 (1962), the Court pointed out that a consequence of amending the indictment is that the defendant "could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." "Thus, the Fifth Amendment forbids amendment of an indictment by the Court, whether actual or constructive." *United States v. Wacker*, 72 F.3d 1453, 1474 (10th Cir. 1995).

Dep't of Justice, *236. Amendment of Indictments*, https://www.justice.gov/archives/jm/criminal-resource-manual-236-amendment-indictments.

### Judgment of Acquittal Standard

Under Rule 29, a defendant may move for Judgment of Acquittal within 14 days after a guilty verdict. Fed. R. Crim. P 29(c). The Rule 29 standard is viewed through the lens of the immense burden that the Government carries in criminal cases: "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime **beyond a reasonable doubt**." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis added).

### New Trial Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A motion for new trial can be premised on the argument that the 'verdict was against the manifest weight of the evidence . . . .'" *United*

*States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015).  "When considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror; and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice."  *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).

## ARGUMENT

The Court should grant Ms. Robinson an acquittal on Counts 11, 12, 19, and 20, as the Government has completely failed to satisfy the Rule 29 standard based on the allegations in the Second Superseding Indictment.  To the extent the Government amended its indictment in contravention of the Fifth Amendment, the Court should not consider those amended allegations in determining whether to grant Ms. Robinson an acquittal.  However, even if the Court allows the Government to side-step the Fifth Amendment, the Government's new allegations and theories also fail as a matter of law under Rule 29.

Alternatively, if the Court is unwilling to grant an acquittal to Ms. Robinson, then the Court should, at a minimum, grant her a new trial based on the Government's flagrant violations of the Fifth Amendment.  Furthermore, even without considering the Government's Fifth Amendment violations, the Court should still grant Ms. Robinson a new trial under Rule 33 because the evidence in this case weighs heavily against the jury's verdict on Counts 11, 12, 19, and 20.

### I.      Counts 11 and 12

The Court should grant Judgment of Acquittal on Counts 11 and 12, as the Government has failed to prove the scheme or artifice to defraud that they alleged in the Second Superseding Indictment:  Katrina Robinson stole or misapplied grant funds in violation of the grant terms and made two expenditures that served as the basis for wire fraud counts.  Even if the Court is willing to overlook the Government's failure to prove what was alleged and presented to the Grand Jury

16

in the Second Superseding Indictment, the Court should still grant Judgment of Acquittal.  The Government's new theory fails under the Rule 29 standard because the Government failed to offer any proof that, at the time of the expenditures, Katrina Robinson had made any material misrepresentations or had knowingly participated in or devised a scheme to defraud.  Furthermore, the Government also failed to offer any proof that, at the time of the expenditures on June 3 or June 26, Katrina Robinson had an intent to defraud.  Alternatively, if the Court finds that Counts 11 and 12 survive under Rule 29, the Court should grant a new trial because "justice so requires" based on the "manifest weight of the evidence" on these counts, which clearly shows that Katrina Robinson was neither engaged in a scheme to defraud to obtain money or property nor had any intent to defraud.

A. *Judgment of Acquittal on the Government's Second Superseding Indictment*

First, the Court should grant Judgment of Acquittal based on the actual allegations in the Second Superseding Indictment.  In the Second Superseding Indictment, the Government alleged that Katrina Robinson engaged in a scheme or artifice to defraud by stealing and/or misapplying grant funds in violation of the grant terms.  Essentially, the Government alleged that the scheme to defraud was to commit theft, embezzlement, or intentional misapplication, (Second Superseding Indictment, ECF 107, at ¶ 5), of grant funds, and, thus, the Government made Wire Fraud Counts 5-17 dependent on the successful proof of § 666 Counts 1-4.   When the Government was unable to prove that grant funds had been used in violation of the grant terms, the Court granted acquittal on Counts 1-4.  Then, as a result of that decision, the Court granted Judgment of Acquittal on Counts 5-17 (except 11 and 12).  The Court made an exception for Counts 11 and 12 because the Government's misleading and incomplete presentation of Exhibit 83 allowed the Court to find that there was some evidence to show that two wedding expenditures may have been connected to grant

funds.  The Court and the Government were both very clear that the Government would still need to continue on their original theory and prove that these wedding expenditures were made with grant funds.

Based on the proof, even looking at the evidence in the light most favorable to the Government, no rational juror could find that the Government proved their theory of prosecution beyond a reasonable doubt on Counts 11 and 12.  Exhibit 83 was the only evidence offered by the Government in support of Counts 11 and 12.  The Government found a way to show part of that email approximately 10 times during its closing and made no other argument.  However, Exhibit 83, when combined with Exhibit 94 and the testimony of Mr. Nyaku, clearly shows that the classifications (including those that served as the basis for Counts 11 and 12) listed by Katrina Robinson in the response email were **non-grant categories**.  *Supra at* 12-13.  In fact, the evidence is so strong, based on the other expenditures and especially the $497.09 equipment rental charge billed to "THI" instead of "GOV," that there is simply no way that a rational juror could conclude beyond a reasonable doubt that Ms. Robinson made those two expenditures with federal grant funds.  Recognizing this fact, the Government did not even attempt to make such an argument during closing argument or rebuttal.  As the Government failed to show that these two expenditures were made with grant funds, the Court should grant Judgment of Acquittal on Counts 11 and 12.

B.  *Judgment of Acquittal on the Government's Actual Proof*

Even if we assume that, despite the allegations presented to the Grand Jury and included the Second Superseding Indictment, the Government did not have to prove that the expenditures in Counts 11 and 12 were actually made with grant funds, the Court should still grant Judgment of Acquittal on Counts 11 and 12 because the Government's theory of wire fraud fails as a matter of law.  First, the Government did not allege any material misrepresentation, an essential element

under 18 U.S.C. § 1343, related to this new alleged scheme.  In the Second Superseding Indictment (as redacted), the only misrepresentations alleged were those contained in Paragraph 8(b)-(d), and the Court required the Government to file a bill of particulars detailing those misrepresentations to HRSA.  "Once a bill of particulars is filed, it confines the Government's evidence to the particulars furnished, and therefore restricts the Government's proof."  *United States v. Martin*, 822 F.2d 1089 (Table) (emphasis added).  None of those misrepresentations alleged in the Indictment (as redacted) relate to 2015-2016, and, to the extent, the Government tries to rely on misrepresentations outside the Second Superseding Indictment and/or Bill of Particulars, the Court should not consider that evidence.  As the Government failed to allege a material misrepresentation in support of their new theory, the Court should grant Judgment of Acquittal on Counts 11 and 12.

Furthermore, even if we assume that the Government has alleged (or proven) a material misrepresentation, under the wire fraud statute, the Government still must prove that a wire was made "in furtherance of the scheme" to obtain money or property.  Here, the Government alleged two wires:  (11) a June 3, 2016 expenditure with GP Entertainment and (12) a June 21, 2016 expenditure with Facegyrl.  The Government has offered no proof that there was any scheme to defraud to obtain money or property at the time of the expenditures.  Nor does the government allege any misrepresentations at the time either of the expenditures were made.  In fact, the undisputed proof from Mr. Nyaku is that Katrina Robinson was allowed to spend the profits of THI however she saw fit.  If the Government has not offered any proof of an alleged scheme at this time, then there is no way that a rational jury could find beyond a reasonable doubt that these expenditures were *in furtherance* of the alleged scheme to obtain money or property.  As such, the Court should grant Judgment of Acquittal on Counts 11 and 12.

C. *Motion for New Trial*[11]

Alternatively, the Court should, at the very least, grant a new trial.  First, the Court should grant a new trial because the Government has essentially amended the Indictment by abandoning its original theory of prosecution, *i.e.*, Katrina Robinson misapplied grant funds when she spent them on wedding expenditures not allowed under the grant.  "An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them." *Robison*, 904 F.2d at 369 (quoting *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989)).  Here, the Government, in abandoning its theory that Katrina Robinson actually made these expenses with grant funds, is essentially amending the Second Superseding Indictment.  Instead, the Government focused solely on later emails with Ms. Foster after Ms. Robinson had obtained the "money or property" under the Government's original wire fraud theory.  In doing so, the Government relied exclusively on alleged misrepresentations that were not included in the Second Superseding Indictment or the Bill of Particulars, and, as such, the Government has amended the indictment on that essential element of wire fraud as well.  This is per se prejudicial and requires a new trial, if not outright acquittal.

Under Rule 33, the Court should also grant a new trial because the weight of the evidence is against the jury's verdict on Counts 11 and 12.  Here, for the first time, the Court actually gets to act as a thirteenth juror and weigh the evidence to ensure that there is not a miscarriage of justice, and the Court should grant a new trial to do just that.  The evidence that Katrina Robinson was engaged in a scheme to defraud to obtain money or property at the time that she made the expenditures in Counts 11 and 12 is almost non-existent.  In fact, the only evidence that the

---

[11] To the extent Ms. Robinson goes into more detail on the proof here and is trying to avoid a duplication of effort, she respectfully requests that the Court consider all discussion of the evidence in deciding both motions for Judgment of Acquittal and New Trial.

Government cited in its closing argument was a portion of Exhibit 83, an email from **late July 2016**, where Katrina Robinson says to put five expenditures under the ADRD grant. In so arguing, the Government essentially ignored the bottom half of the email where Katrina Robinson listed non-grant categories for each of the five expenditures, which significantly cuts against any allegation of a scheme to obtain grant money or property for personal expenditures. *See supra* at 12-13. Furthermore, because there is no proof of a scheme at the time of the expenditures, the Government could not adequately prove (1) that she had an intent to defraud or (2) that the expenditures (aka the charged wires) were somehow in furtherance of a scheme to obtain money or property.

Furthermore, the undisputed evidence clearly shows that (1) Katrina Robinson deposited cash in the amount of $3,400 in July 2016 (approximately $84 off from the combined amounts alleged in Counts 11 and 12) and (2) THI had not received any grant funds in the month of June. Obviously, the Court's weighing of the July 2016 cash deposit will depend somewhat on how much weight the Court gives to Ms. Robinson's testimony, but, regardless of Ms. Robinson's testimony, the amount itself is certainly persuasive proof that these THI expenditures were reimbursed, which obviously cuts against any alleged intent to defraud under wire fraud. (Trial Ex. 102.) Meanwhile, the Regions records, (Trial Ex. 18, Bates 1778), and the deposit chart created by Victoria Howell (Trial Ex. 62) show that no grant funds were deposited in June. This is further proof that there was no scheme or artifice to defraud to obtain money or property at the time that these expenditures were made as THI had not received any money or property from the grant in June when these expenditures took place.

As such, the evidence clearly weighs against the jury's decision in this matter, and the Court should, at a minimum, grant Ms. Robinson a new trial.

21

## II.     Counts 19 and 20

Likewise, the Court should grant Judgment of Acquittal on Counts 19 and 20 or, at the very least, grant Ms. Robinson a new trial.  First, the Court should grant Judgment of Acquittal based on the Government's actual allegations in the Second Superseding Indictment, as the Government completely failed to prove the scheme alleged in the indictment.  Next, even if the Court allows the Government's amended indictment to stand, in clear contravention of the Fifth Amendment, the Government's new "lulling theory" also fails as a matter of law because the Government has completely failed to prove the underlying scheme to obtain money or property to support that theory.  Finally, at the very least, the Court should grant Ms. Robinson a new trial based on the Government's violation of the Fifth Amendment and the weight of the testimony.

### A.   *Judgment of Acquittal on the Allegations in the Second Superseding Indictment*

In the Second Superseding Indictment, the Government alleged that Counts 19 and 20 contained the misrepresentations underlying the overall scheme to defraud.  The Court acquitted Ms. Robinson on the scheme to defraud for those years (Counts 3 and 4 and the corresponding expenditures in Counts 5-17), and, as result, the Court planned to grant Ms. Robinson an acquittal on Counts 19 and 20.  At that time, the Government attempted to amend its Indictment and argued a new scheme that was neither presented to the grand jury nor included in the Second Superseding Indictment.  For the first time (and completely unhinged from the Second Superseding Indictment), the Government argued a new scheme: Katrina Robinson made misrepresentations in the APRs alleged in Counts 19 and 20 as a part of scheme to continue to get additional grant funding and/or lull the Government into not trying to claw back funds.  It is clear that Ms. Robinson was, thus, tried for crimes based on facts not included in the indictment that was presented to the grand jury.

Ms. Robinson objected to the Government's attempt to amend the Second Superseding Indictment, but the Court allowed the Government to proceed on its new amended indictment. This was error, as "the Fifth Amendment forbids amendment of an indictment [even] by the court." *United States v. Wacker*, 72 F.3d 1453, 1474 (10th Cir. 1995); *see also* Dep't of Justice, *236. Amendment of Indictments*, https://www.justice.gov/archives/jm/criminal-resource-manual-236-amendment-indictments (quoting same).

Ms. Robinson again contends that the Court should bar the Government from amending its Indictment and grant Judgment of Acquittal on Counts 19 and 20 as the Government simply failed to prove the scheme that it alleged in the Second Superseding Indictment. With no scheme to obtain money or property, there is no wire fraud.

### B. *Judgment of Acquittal on the Government's New Theory-*

Even if the Court decides not to grant Judgment of Acquittal on the actual allegations in the Second Superseding Indictment, the Court should still grant Judgment of Acquittal on Counts 19 and 20. The Government, after amending its allegations, attempts to proceed on a "lulling theory" for Counts 19 and 20, but this argument fails as a matter of law for several reasons. First, a lulling theory still requires the Government to actually prove an underlying scheme to defraud. *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994) (A wire "will be in furtherance of the scheme to defraud if it meets the foreseeability requirement and **is closely related to the scheme**.") Here, the Government has neither alleged nor proven a scheme to obtain money or property that would underlie the lulling theory. Instead, the Government relies solely on alleged falsities in the APRs and attempts to turn the wire fraud statute into the false statements statute, 18 U.S.C. § 1001, which does not require a scheme to defraud. Because no rational jury could find that Ms. Robinson

23

was engaged in a scheme to defraud based solely on the APRs, they could not have found beyond a reasonable doubt that Ms. Robinson committed wire fraud as argued by the Government.

Additionally, a lulling theory cannot be used "when the fraudulent scheme has been put to ultimate rest." *Id.* Here, because the Government has failed to offer any actual proof on the alleged scheme to defraud for Counts 19 and 20, a jury could not have found, beyond a reasonable doubt, that the APRs were submitted before the alleged fraudulent scheme (whatever that is) had been put to rest. As the Government has not defined, argued, or offered proof of the actual scheme, their lulling theory must fail, and the Court should grant Judgment of Acquittal on Counts 19 and 20.

### C. *Motion for New Trial*

Even if the Court finds that the Government had enough evidence to survive Judgment of Acquittal, the Court should still grant Ms. Robinson a new trial. First, as with Counts 11 and 12, the Court should grant Ms. Robinson a new trial because her Fifth Amendment right to be tried based on an indictment presented to the grand jury was clearly violated here. The Government has not even denied that it amended the indictment and alleged a completely new scheme. This is per se prejudicial, but, even still, there is no doubt that Ms. Robinson was deprived of the ability to cross examine multiple witnesses from the Government on this new theory. As such, on that basis alone, the Court should grant Ms. Robinson a new trial.

Next, the Court should also grant Ms. Robinson a new trial based on the weight of the evidence. The Government's new theory of prosecution under Counts 19 and 20 is almost completely unsupported by the evidence. The Government relies on the following evidence to establish a scheme to defraud to obtain money or property, material misrepresentations, and an intent to defraud: (1) Nina Tumosa's testimony that the APRs are a requirement for continued

funds; (2) there were mistakes or falsities related to claimed HRSA scholarships on the APRs in 2017-2018 and 2018-2019 as described by Agent Haines; and (3) a THI login was used to submit the reports. That is it.

First, to the extent that the Government is relying on Agent Haines testimony regarding the inability to match ID numbers to student social security numbers in Count 19, the Government has failed to prove that these were misrepresentations. In fact, the undisputed evidence shows that social security numbers were not supposed to be used. Dr. Tumosa stated specifically that social security numbers were not supposed to be used for the ID numbers on the APRs. (Testimony of Nina Tumosa and Bruce Holmes, ECF 144, at 27-28, 109, 111.) The instructions for the APRs state the same. (Trial Ex. 75 at 206-207.) When asked about this issue, Agent Haines admitted that he had not read the instructions and that he would not be surprised if Nina Tumosa had testified that grantees were not supposed to use social security numbers. (Cross Examination of Richard Haines, ECF 156, at 56-57.) Agent Haines also testified that he had "no idea" if THI had a list that would have matched the ID numbers on the APR to the ID numbers used at THI. (*Id.* at 61.) As such, the Government cannot rely on the ID number issue, as the proof shows that this was not a misrepresentation. On this basis, the Court should also largely discount the weight of Agent Haines' testimony, as it is clear that he did not understand the APRs and did not properly investigate how they were supposed to be filled out or used by the grantees or the Government.

Meanwhile, the undisputed proof from multiple witnesses and exhibits undercuts the Government's thin proof of wire fraud based on the alleged misrepresentations related to claimed HRSA scholarships. First, the undisputed facts show that the APRs had very little, if anything, to do with actual funding,[12] so the Government has very little to show that this was somehow a

---

[12] There is even less proof that the claimed number of HRSA scholarships on the APRs had some bearing on continued funding. The Government did not even ask this question of Nina Tumosa, and Richard Haines did not testify that the

scheme *to obtain money or property*. The bulk of Dr. Tumosa's testimony regarding the APRs was that they were used to report demographics to Congress. (Testimony of Nina Tumosa and Bruce Holmes, ECF 144, at 14-15, 27-28, 136-37.) The APRs show this as well, as the summaries included on the APRs do not even include the number of students who were claimed as scholarship students; instead, the summaries of data include demographic information, such as age, gender, race, and financial need. (Trial Ex. 3.) Meanwhile, Agent Haines specifically testified that the APRs have no direct tie to funding, agreeing that the APR for each year is submitted after funding has been received for the previous year and after funding has been awarded for the next year. (Cross Examination of Richard Haines, ECF 156, at 15-16.) Further, he testified that he did not look at the financial records to determine the actual number of HRSA scholarships awarded. (*Id.* at 15-16, 34.)

In addition to largely failing to show that the APRs were somehow related to a scheme *to obtain money or property*, the undisputed proof shows that there was no need to inflate the numbers, which further undercuts any alleged intent to defraud. Agent Haines testified that, in 2017-2018, THI received scholarship funding for 100 students (approximately $90,000).[13] (*Id.* at 22.) Meanwhile, he explained that he found proper scholarship paperwork for 161 students in 2017-2018. (*Id.*) As such, in 2017-2018, there was simply no reason for Katrina Robinson to make misrepresentations on the APR about the number of scholarships, as she had clearly satisfied her obligation under the grant and the Notice of Award for that 2017-2018. Furthermore, Haines also testified that THI only reported 234 students going through the program on the 2017-2018

---

number of scholarships claimed on the APR had anything to do with continued funding. This calls into question whether the Government even proved that the claimed misrepresentations were material.

[13] Agent Haines tried to discuss carryforward money on cross examination, but all of the NOAs, including those that included the carryforward awards, listed the same amount for tuition and fees. *See supra* at 5.

APR when he actually found that 250 students had attended THI that year.  This evidence further proves that Katrina Robinson could not have had an intent to defraud because there would be no benefit to underreporting the number of students.  Instead, this evidence shows that the only thing that potentially happened in the APRs was a series of mistakes, something that Agent Haines also did when doing his analysis.

On Count 20, the same is true.  Richard Haines testified that, no matter what Notice of Award you review, THI only received funding for 100 HRSA scholarships, and he testified that he had no doubt that THI had the proper paperwork for that many students.  Thus, the undisputed proof is that Katrina Robinson had no reason to lie, as she and THI had successfully satisfied their part under the grant.

Additionally, on the issue of intent to defraud, there is further evidence that shows that the Government failed to meet their burden.  First, there is little to no proof that Katrina Robinson entered the alleged misrepresentations or even reviewed them.  Ieshia Wesley testified that she entered the data for 2017-2018 and 2018-2019, and this testimony was corroborated by Courtney McNeal and Shani Wilhite.  They all testified to the difficulties of filling out these APRs, and Ms. Wesley even testified about the issues that the system had with deleting (or refusing to delete) data in the APRs.  (*See* Trial Ex. 8; *see also* Testimony of Nina Tumosa and Bruce Holmes, ECF 144, at 123-24.)

Finally, all of the former THI employees testified definitively that Katrina Robinson never told them that she wanted them to inflate the numbers or make any sort of misrepresentations on the APRs.  Agent Haines also testified that he found no evidence that Katrina Robinson ever told any of her employees to falsify data on the APRs.  (Cross Examination of Richard Haines, ECF 156, at 4-6.)

The weight of the evidence clearly shows that Katrina Robinson did not have a plan or scheme to defraud the government of money or property based on these APRs.  Furthermore, the Government has failed to show that Katrina Robinson had any intent to defraud, as everyone agrees that she neither entered the data nor told anyone to falsify data in those reports.  Meanwhile, there was simply no reason to make misrepresentations on these APRs, as they were not directly tied to funding and THI had satisfied their end of the bargain under the grant.

*  *  *

The Government created this mess.  In an over-reaching and confusing indictment, the Government alleged that Katrina Robinson stole $600,000 in grant funds and spent them on personal expenditures that were not allowed under the grant.  The Government completely failed to prove that Katrina Robinson spent any grant funds on personal expenditures.  In the Second Superseding Indictment, the Government based their wire fraud theory on those alleged thefts (or misappropriations) and the alleged misrepresentations in Counts 18-20.  After the Government failed to offer enough proof to survive Judgment of Acquittal on their theory of the scheme, the Court struck days' worth of prejudicial testimony related to legal expenditures made by Ms. Robinson, and the Government then essentially amended their indictment over the objection of Ms. Robinson.  Throughout the second half of trial, the Government constantly shifted its theory and prejudiced Ms. Robinson in her ability to fairly defend herself.  This intentional shift in legal theories of criminal culpability occurred after it had improperly introduced mounds of prejudicial facts to the jury.  If ever there were a time that "the interest of justice" requires a new trial, it is these exact circumstances.  Ms. Robinson respectfully requests that, at a bare minimum, the Court grant her a new trial under Fed. R. Crim. P. 33(a).

28

## **CONCLUSION**

Ms. Robinson is entitled to Judgment of Acquittal on Counts 11 and 12 because the Government completely failed to prove its theory of the scheme to defraud.  Additionally, on those Counts, the Government has shown no evidence of any actual misrepresentation (related to these wedding expenses) that was alleged in the Second Superseding Indictment or the bill of particulars.

If the Court is unwilling to grant Ms. Robinson an acquittal on Counts 11 and 12, then the Court should grant a new trial.  Not only did the Government amend their indictment in violation of the Fifth Amendment, but the weight of the evidence does not support the verdict on these counts.

Ms. Robinson is also entitled to Judgment of Acquittal on Counts 19 and 20 because the Government completely failed to prove the allegations in the Second Superseding Indictment.  To the extent the Court allowed the Government to amend their indictment, this was an error, and the Court should grant Ms. Robinson an acquittal on the charges that were actually indicted and presented to the grand jury.

At the very least, the Court should grant a new trial based on the Government's amendment of the indictment.  Even if the Court is unwilling to grant a new trial based on the Government's clear violation of the Fifth Amendment, the Court should grant a new trial because the weight of the evidence weighs heavily against the jury's verdict on counts 19 and 20.

Respectfully submitted:

s/L. Mathew Jehl
Lawrence J. Laurenzi (TN #9529)
L. Mathew Jehl (TN #38251)
Burch, Porter & Johnson, PLLC
130 North Court Avenue
Memphis, TN 38103
Tel: (901) 524-5000
Fax: (901) 524-5024
Email: llaurenzi@bpjlaw.com
Email: mjehl@bpjlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will operate to provide notice of this filing to all counsel of record in this case.

s/L. Mathew Jehl
L. Mathew Jehl