# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cr-20148-SHL |
| | ) | |
| KATRINA ROBINSON, | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AS TO COUNTS 11 AND 12; GRANTING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AS TO COUNTS 19 AND 20; AND DENYING DEFENDANT'S MOTION FOR NEW TRIAL

On September 30, 2021, following an eleven-day trial, a jury found Defendant Katrina Robinson guilty of four counts of wire fraud, in violation of 18 U.S.C. § 1343. Now before the Court are Robinson's Consolidated Motion for Judgment of Acquittal and Motion for New Trial, (ECF No. 170), the Government's Response, (ECF No. 183), and Robinson's Reply to the Government's Response. (ECF No. 186.) Robinson argues that the evidence presented at trial was insufficient to convict her of counts 11, 12, 19 and 20 of the Second Superseding Indictment, and thus a judgment of acquittal must be entered. Alternatively, Robinson contends that she is entitled to a new trial because the Government shifted theories of prosecution mid-trial, which resulted either in a constructive amendment of the Indictment or a prejudicial material variance. Additionally, even if the Government did not shift theories, Robinson still urges the Court to order a new trial because, she argues, the weight of the evidence presented at trial weighs against the jury's verdict on counts 11, 12, 19 and 20. In response, the Government contends that no constructive amendment or prejudicial variance occurred, and Robinson's convictions should stand. (ECF No. 183.)

For the reasons outlined below, the Court **DENIES** Robinson's Motion for Judgment of Acquittal as to counts 11 and 12; **GRANTS** that Motion as to counts 19 and 20; and **DENIES** her Motion for New Trial.

## PROCEDURAL BACKGROUND

In July 2020, Katrina Robinson was indicted in connection with her leadership and ownership of The Healthcare Institute ("THI"), a nursing school, and its management of funds received under a Health Resources and Services Administration ("HRSA") grant.  (ECF No. 8.) A Second Superseding Indictment, returned on August 17, 2021, charged Robinson with four counts of embezzlement or intentional misapplication of federal funds under 18 U.S.C. § 666(a)(1)(A) and sixteen counts of wire fraud under 18 U.S.C. § 1343.  (ECF No. 107.) Specifically, Robinson was charged with stealing property worth at least $5,000 owned by, and under the custody and control of THI, which received in excess of $10,000 in federal grant funds from HRSA during the following grant periods: July 2015-June 2016 (count 1), July 2016-June 2017 (count 2), July 2017-June 2018 (count 3), and July 2018-June 2019 (count 4).  (Id.)  Counts 5-20 charged Robinson with wire fraud, including individual transactions that she allegedly made from THI's Operating Account using grant funds (counts 5-17), and electronic transmission to HRSA of THI's Annual Performance Reports ("APRs") containing allegedly fraudulent misrepresentations (counts 18-20).  (Id.)

Trial[1] began on September 13, 2021.  (ECF No. 133.)  On Robinson's Motion for Judgment of Acquittal at the end of the Government's case in chief, the Court dismissed counts

---

[1] Before trial, Robinson filed a Motion for a Bill of Particulars to obtain a list of THI students alleged as the basis for counts 18-20 in the First Superseding Indictment.  (ECF No. 77.)  After a hearing, the Court granted the Motion, (ECF No. 90), and the Government filed a Bill of Particulars listing the students to which the First Superseding Indictment referred.  (ECF No. 92.)

1-10 and 13-17.  (ECF Nos. 153, 154, 175.)  As to counts 11, 12, 18, 19, and 20, the Court found

"sufficient evidence at this stage to deny the motion."  (ECF No. 175 at PageID 1816.)

Three weeks later, on September 30, 2021, the jury found Robinson guilty as to counts

11, 12, 19, and 20 of the Second Superseding Indictment, and not guilty as to count 18.  (ECF

No. 163.)  One week later, on October 8, 2021, Robinson filed this Motion.  (ECF No. 170.)  On

October 28, 2021, the Government filed its Response to Robinson's Motion, (ECF No. 183), and,

on November 3, 2021, Robinson filed her Reply to the Government's Response.  (ECF No. 186.)

## FACTUAL BACKGROUND

Robinson argues that the evidence presented at trial was insufficient to convict her of

counts 11, 12, 19 and 20.  The following facts come from the trial testimony.  Where there is

relevant conflicting evidence, it is noted.

### I.   Counts 11 & 12

Counts 11 and 12 charge Robinson with improperly using HRSA grant funds to pay for

two personal expenditures related to her wedding, in furtherance of a scheme to defraud HRSA:

count 11 involves a payment to GP Entertainment/Pittstop Tapas and Catering ("GP

Entertainment"), and count 12 reflects a payment to Nikki Chaffen, a makeup artist owning a

---

Also before trial, the Government filed a Motion in Limine in response to Defendant's disclosure
of two potential trial expert witnesses, including an attorney and an accountant.  (ECF No. 104.)
At the hearing on the Motion, the Government stated that the criminal charges were not based on
Robinson's violation of corporate structure.  The Court therefore granted the Motion, concluding
that there was no need for evidence related to the legal and financial regulations applicable to
various corporate structures, given the Government's position.  However, the Court also ordered
the Government to file a memorandum explaining its legal theory of prosecution.  (ECF No.
114.)  The Government subsequently filed its Pretrial Memorandum on Applicable Rules,
Regulations, and Policies, (ECF No. 117), outlining how "THI was constrained by the terms of
[its HRSA] award as to how grant money could be spent" under federal regulations, including
certain expenditure categories that were "never allowable," including purchases of "good and
services for [Robinson] herself."  (Id. at PageID 550.)

business called Facegyrl.  (ECF No. 107, Second Superseding Indictment, at PageID 441.)
Relevant trial testimony was provided by witnesses Victoria Howell, an FBI forensic accountant;
Bruce Holmes, a Grants Management Specialist with HRSA; Jonathan Nyaku, a Certified Public
Accountant and owner of Memphis Consulting Group ("MCG"), who served as THI's
outsourced controller during the grant period; and Robinson herself.

The Government first supported its theory that Robinson engaged in wire fraud with the
testimony of FBI forensic accountant Howell, who testified to bank records showing that the
purchases reflected in counts 11 and 12 were made from THI's Operating Account at Regions
Bank.  (ECF No. 141.)  For count 11, Howell verified a payment of $2,326.01 made to GP
Entertainment on June 3, 2016.  (Id.)  For count 12, she identified a payment of $1,158.05 made
to Nikki Chaffen, owner of Facegyrl, on June 21, 2016.  (Id.)  Records from other sources also
supported these charges: GP Entertainment records showed receipt of payment for catering
services for Robinson's wedding, (Trial Ex. 47), and Nikki Chaffen authenticated an invoice for
providing makeup services to Robinson and her wedding party.  (ECF No. 140; Trial Ex. 28).
On cross-examination, however, Howell conceded that her chart outlining deposits into THI's
Operating Account showed that, while grant funds were periodically deposited into this account,
no grant funds were actually deposited into that account in June 2016, the month of both
expenditures.  (Trial Ex. 62.)

Next, HRSA's Grant Management Specialist Holmes reviewed THI's Notices of Awards
– documents provided annually to THI as a HRSA grant recipient, outlining conditions and terms
of the grant awarded – and testified that "the costs of goods or services for the personal use of
the recipients' employees," such as Robinson, would never be allowed under these governing
documents.  (ECF No. 144 at PageID 1189.)

4

Mr. Nyaku, THI's outsourced controller from MCG, then testified.  He stated that HRSA grant funds obtained by THI were committed to their Certified Nursing Assistant ("CNA") program and the Alzheimer's and Other Related Dementias ("ADRD") education program. (ECF No. 176 at PageID 1854.)  Stating that his team "relied exclusively on Ms. Robinson" to provide information on how to classify grant and non-grant expenses and transactions, he explained that if there were questions about classifications, an MCG employee would ask Robinson about them and accept her answer.  (Id. at PageID 1856.)  An engagement letter between MCG and THI established that Robinson was expected "to give [them] full disclosure about every transaction."  (Id.)  Moreover, Mr. Nyaku testified that any of Robinson's personal expenditures brought to MCG's attention would go on THI's balance sheet because they would not pass an "allowability test" to be charged to the grant, but he did not recall many expenses being identified as personal expenses.  (Id. at 1856-57.)

Critically, Nyaku also testified that Phylea Foster, a manager at MCG charged with processing THI's transactions, would email Robinson for clarification when she did not recognize certain transactions.  (Id. at PageID 1864-65.)  Nyaku authenticated and testified to an email exchange between Robinson and Foster, (Trial Ex. 83) (hereinafter "Robinson-Foster email"), in which Robinson responded to Foster's request for clarification as to the nature of several June 2016 transactions, including the GP Entertainment and Facegyrl expenditures reflected in counts 11 and 12.  In that exchange, Robinson appeared to respond to Foster's question about these transactions with a statement that they "were purchases for our community patient education event [and] . . . should be under our ADRD funds for grant accounting purchases."  (Id. at PageID 1866-68; Trial Ex. 83.)  She also listed classifications next to each expenditure named in the email, apparently categorizing the GP Entertainment purchase as an

"Event Package including rentals and Branded giveaways" and the Facegyrl purchase as "Professional Services."  (Trial Ex. 83.)

In her testimony, Robinson emphatically contested the Government's proof.  On direct examination, she denied using grant funds to pay for her wedding expenses.  (ECF No. 171, Testimony of Katrina Robinson, at PageID 1508-09.)  She admitted that she paid for wedding expenses out of THI's Operating Account but explained that her now-former husband later deposited cash back into the account to offset those expenses.  (Id. at PageID 1518-19 ("they [the wedding expenses] were about [$]3483. I think we deposited a cash deposit of $3400 to cover those expenses.").)  She also identified several deposit slips showing cash deposited into THI's Operating Account, which she stated accounted for this reimbursement.  (Id. at PageID 1519-1521.)

Next, she explained the context of her email correspondence with Ms. Foster.  (Id. at PageID 1510).  Robinson alleged that her email response to Foster actually followed a phone conversation that she and Ms. Foster had earlier that morning.  (ECF No. 171 at PageID 1512.)  According to Robinson, the ADRD funds referenced in the email related to something discussed in their phone conversation, not to Foster's request for clarification on the expenses in the email itself, and that the classifications she wrote next to each expense in Foster's email were not related to grant categories.  (Id. at 1513-14.)  Specifically, Robinson testified that the GP Entertainment expense was a non-grant "event package with rentals and branded give-aways," and that the Facegyrl expense was for non-grant-related "professional services."  (Id.)

Turning to her June 2016 financial statement for THI (Exhibit 83), Robinson testified that THI and grant-related expenditures were separately categorized.  (ECF No. 171 at PageID 1515-16.)  Comparing this financial statement with her email correspondence with Foster, Robinson

6

explained that characterizing the GP Entertainment expense as an event package meant to categorize it under the THI category "meals and entertainment" and that characterizing the Facegyrl expense as "professional services" meant to categorize it under the THI category "professional fees." (Id. at PageID 1517-18.) She explained that grant expenditures were categorized as "GOV," and the GOV categories did not include "professional fees" or "meals and entertainment." (Id. at 1516-17.)

On cross-examination, the government stayed on the topic of her email exchange. (ECF No. 172 at PageID 1630.) After conceding that the GP Entertainment and Facegyrl expenses were indeed for her wedding, Robinson again testified on cross that her email's ADRD reference related to an unconnected phone conversation, but that her descriptions next to each transaction responded to Foster's initial query. (Id. at PageID 1630-34.) However, she admitted that she did not disclose to Foster that the GP Entertainment and Facegyrl expenses were personal expenses for her wedding. (Id. at PageID 1636.) She also admitted that her cash deposits did not indicate that they were to reimburse THI for these expenses. (Id.) Finally, on re-direct, Robinson reinforced that an event package would go under the THI category of "meals and entertainment" and professional services under the THI category of "professional fees," and that those categories did not exist as grant-funded ones. (ECF No. 172 at PageID 1652.)

## II.    Counts 19 & 20

Counts 19 and 20 charge Robinson with submitting Annual Performance Reports ("APRs") in the years 2017-18 (count 19) and 2018-19 (count 20) to HRSA that contained fraudulent misrepresentations as to THI's operations, in furtherance of a scheme to defraud HRSA. (ECF No. 107 at PageID 443.) Relevant testimony as to these counts was provided by Dr. Nina Tumosa, a project officer from HRSA who managed HRSA's Geriatrics Workforce

7

Enhancement Program ("GWEP"), under which THI was a grantee; Special Agent Richard

Haines from the United States Department of Health and Human Services ("HHS"), Office of the

Inspector General; several THI employees; and, again, Robinson.

First, Dr. Tumosa explained how HRSA provided oversight to THI's grant. She testified

that grantees received a Notice of Award (NOA), which contained "an approved budget," "terms

and conditions," and other "reporting requirements" for HRSA to monitor the grant's progress

and spending. (ECF No. 144 at PageID 1045.) She stated that one of HRSA's reporting

requirements, the APR, "describes a variety of things . . . that allows the project officer to

determine whether the project director was successful in meeting her – the stated goals," and is

"due at the end of each year of funding." (Id. at PageID 1047.) She noted that HRSA found the

APR data "really crucial" because the reports are submitted to Congress and demonstrate

whether the funded program's purposes have been met. (Id. at PageID 1061.) Describing how

grant recipients submitted their APRs through HRSA's Electronic Handbook ("EHB") platform,

Dr. Tumosa testified that project directors must first certify that the information contained in an

APR is correct and then must submit the report on the EHB platform. (Id. at PageID 1063-64.)

This testimony was fortified by the testimony of Sriniva Panguluri, the system owner of

the EHB platform, who noted that each grant project can only have one project director who is

authorized to submit official documents for the grant, including APRs. (ECF No. 178 at PageID

2012.) On this same note, Dr. Tumosa confirmed that Robinson signed the APRs for the

specified grant years. (ECF No. 144 at PageID 1063-64.) She also noted that every student who

qualified for a scholarship under the terms of THI's grant from HRSA "would receive $900

towards their [THI] tuition payment from the HRSA grant." (Id. at PageID 1043-44.)

On cross-examination, Dr. Tumosa admitted that the EHB system on which the APRs were uploaded had technological issues, and that Ieshia Wesley, a THI employee, had reached out to the HRSA helpdesk with complaints.  (ECF No. 144 at PageID 1149.)  Testimony of those difficulties multiplied as Chelsey Cox and Shani Wilhite – defense witnesses – also described similar problems with the system and affirmed that Robinson never told them to falsify any information on the APRs.  (ECF No. 158.)

Dr. Tumosa also testified on cross-examination that grantees submit noncompeting continuation progress ("NCC") reports that are due before the year's grant funding ends – in contrast to when APRs are due, after funding was over – and agreed that the NCC report allows HRSA "to make a decision as to whether or not the recipient will receive an award for the next year."  (ECF No. 144 at PageID 1109.)  Finally, on re-direct, Dr. Tumosa added that, if HRSA were to become aware of misrepresentations in the APR submissions, then the project officer could have an opportunity to correct the mistake or the grant could be closed to the recipient.  (Id. at PageID 1171.)

Next, Special Agent Richard Haines testified that, when investigating THI through the HHS Office of the Inspector General, he identified several inconsistencies between how THI reported student data to HRSA through its APR submissions and what THI's own records revealed.  (ECF No. 159, Direct and Redirect of Richard Haines, at PageID 1365.)  For grant year 2017-18 (count 19), Haines testified that THI's APR claimed that 215 students received a HRSA scholarship, but THI's records only documented 161 scholarships for that year.  (Id. at PageID 1379; Trial Ex. 73.)  For grant year 2018-19 (count 20), Haines noted that ten of the students reported on THI's APR to have received a HRSA scholarship were actually funded by different sources, according to other THI records.  Also in that year, Haines testified that THI's

APR contained thirty IDs represented as students completing THI's grant-funded CNA program, but Haines concluded from THI's records that no students were actually associated with those ID numbers.  (Id. at PageID 1368.)

On cross-examination, Haines conceded that APRs do not have a direct tie to funding, that he did not review THI's financial records and that he did not know if there was a list kept by THI that matched the student ID numbers on the APR with students.  (ECF No. 156 at PageID 1276-77, 1322.)  He also testified that THI received funding for 100 students for each of the grant periods covered in counts 19 and 20 and did not deny that Robinson had scholarship documentation for that number of students for those years.  (Id. at PageID 1283, 1286.)

Robinson also testified about her role in the APR submissions.  On direct, she explained that while she completed the NCC reports, she instructed her employees to submit the APR reports and had no motive to lie or falsify information on these reports.  (ECF No. 171 at PageID 1525-27, 1537.)  As for the discrepancies pointed out by Mr. Haines, Robinson stated that she lacked the time to review her employees' work and conceded that errors were made, but also emphasized that THI exceeded its goals for providing students with scholarships.  Moreover, she noted that THI's errors constituted both over and under-representation of the number of students receiving grant-funded scholarships from THI, thus illustrating that she had no intent to inflate numbers to gain funding.  (Id. at 1532-48.)

On cross-examination, Robinson agreed that she was the HRSA grant's project director and that her EHB account was that of the authorizing official.  (ECF No. 172 at PageID 1598.)  She agreed that the APRs were submitted via EHB, and she "believe[d]" the APRs were sent through her authorizing account, though she asserted that she directed her employees to submit the reports. (Id. at PageID 1599-1600.)  Robinson also admitted to emailing Dr. Tumosa about

10

APR submissions, which included descriptions of her personal involvement in preparing and submitting the APRs to HRSA. (Id. at PageID 1601-03.)

## ANALYSIS

Robinson challenges her conviction on counts 11, 12, 19, and 20 and seeks either acquittal or a new trial on all counts. The Court therefore divides its analysis into two parts, looking first at Robinson's argument for acquittal, and, second, at her argument for a new trial.

### I.   Motion for Acquittal Based on Insufficiency of Evidence

A motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure is a challenge to the sufficiency of the government's evidence. See United States v. Kuehne, 547 F.3d 667, 696 (6th Cir. 2008). The "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court must construe reasonable inferences from the evidence in the government's favor. United States v. Pollard, 778 F.2d 1177, 1180 (6th Cir. 1985).

Here, all counts at issue charge Robinson with wire fraud. The elements of wire fraud are:

(A) First, that the defendant knowingly participated in, devised, or intended to devise a scheme to defraud in order to deprive another of money or property;
(B) Second, that the scheme included a material misrepresentation or concealment of a material fact;
(C) Third, that the defendant had the intent to defraud; and
(D) Fourth, that the defendant used wire, radio or television communications or caused another to use wire, radio or television communications in interstate commerce in furtherance of the scheme.

Sixth Circuit Pattern Criminal Jury Instructions No. 10.02 (Mar. 21, 2021); ECF No. 160, Jury Instructions, at PageID 1410. The Government's theory for counts 11 and 12 is that Robinson

11

paid for certain wedding expenses with HRSA funds contained in THI's Operating Account in furtherance of a scheme to defraud HRSA.  (ECF No. 170 at PageID 1444.)   The theory for counts 19 and 20 is that Robinson fraudulently misrepresented THI's operations – specifically how many HRSA-funded scholarships were provided to THI's students – to representatives of HRSA by submitting falsified APRs, also in furtherance of the same scheme to defraud.

Robinson argues that the Government failed to prove the scheme described in the Indictment for these four counts.  In opposition, the Government argues that Robinson is not entitled to a judgment of acquittal because the Government's evidence at trial was sufficient to establish all of the elements of wire fraud in furtherance of a scheme to defraud HRSA.  As described below, the Court concludes that Robinson is entitled to a judgment of acquittal as to counts 19 and 20, but not counts 11 and 12.

### A.  Counts 11 and 12

Robinson argues that the Government failed to sufficiently prove the first element of wire fraud, her participation in an existing scheme to defraud as alleged in the Indictment – that Robinson paid for wedding expenses with federal grant funds.  (ECF No. 170 at PageID 1459.) According to Robinson, "the Government presented an incomplete and somewhat misleading picture" of the Robinson-Foster email exchange that (1) excluded the important context of her earlier call with Foster and (2) did not acknowledge that the categories she used in her email resembled THI accounting categories used by Nyaku to categorize non-grant funds.  (Id. at PageID 1462.)  She contends that her email characterizations fit into THI accounting categories, not grant categories: the GP Entertainment charge as an Event Package "fit[s] squarely in [the] 'THI-Meals and entertainment'" category, and the Facegyrl "Professional Services" category was akin to a "THI-Professional Fees" category.  (Id. at PageID 1454.)  Additionally, Robinson

12

notes that the email exchange also contained a $497.09 charge that Robinson described as an "Equipment Rental" – a category only used for THI accounting, not for the grant.  Thus, she contends that, because "it is clear that the $497.09 was part of this category and is included in the non-grant expenditures . . . the actual evidence clearly shows that these five expenses (including those in Counts 11 and 12) were not charged to the grant."  (Id. at PageID 1454.)

As to the element of intent, Robinson argues that the email, when viewed alongside Nyaku's classifications, does not establish her intent to charge wedding expenditures to the HRSA grant.  She also contends that the Government did not offer proof that, at the time of these expenditures on June 3, 2016 or June 26, 2016, rather than at the time of her email exchange, Robinson had the intent to defraud.  (ECF No. 170 at PageID 1458.)  According to her, without evidence of her intent to defraud HRSA at the time that she completed the transactions with Ms. Chaffin and with GP Entertainment, this element cannot be satisfied.

Turning next to materiality, Robinson argues that the Government failed to show that Robinson made any material misrepresentations to HRSA related to counts 11 and 12.  (Id. at PageID 1460.)  She points out that the only misrepresentations listed in the Indictment were those contained in ¶8(b)-(d), and the Government's Bill of Particulars detailing these misrepresentations did not include the Robinson-Foster Email.  (Id.)  Accordingly, Robinson argues that this email should not be considered as a material misrepresentation.  (Id.)

Finally, as to the last element of wire fraud, Robinson contends that the Government failed to show that the wedding expenditures were made in furtherance of a scheme at the time they were made, rather than at the time that Robinson emailed with Ms. Foster.[2]  (Id.)  Similar to

---

[2] Robinson's Motion does not contest that the wires affected interstate commerce, also an essential part of the fourth element of wire fraud.  As noted by the Government in its Response, the transactions reflected in counts 11 and 12 affected interstate commerce because the payments

her argument about intent, Robinson contends that there was no evidence to prove her involvement in a scheme to defraud when she actually paid GP Entertainment and Nikki Chaffen, particularly because "Robinson was allowed to spend the profits of THI however she saw fit." (Id.)  Considering this timeline, Robinson argues that a rational jury could not find beyond a reasonable doubt that the expenditures were made in furtherance of an alleged scheme, because that scheme did not yet exist.  (Id.)

The Government disagrees with Robinson's portrayal of the evidence presented during trial, arguing that the Robinson-Foster email directly established a scheme to defraud, materiality, and intent.  First, the Government argues that the Robinson-Foster email showed Robinson's scheme first to pay wedding expenses out of THI's Operating Account, and then to have those expenses charged to the HRSA grant under the guise of a community patient education event.  Further, her "blatant mischaracterization" of the expenses in this correspondence in the face of "what it plainly appeared to be on its face" amounts to proof of (1) a material misrepresentation made, (2) in furtherance of this scheme, with (3) intent to defraud. (ECF No. 183 at PageID 2056.)  Finally, characterizing Robinson's explanation of the Robinson-Foster email as "an argument for a competing evidentiary inference," the Government contends that her interpretation of categorizing expenses into non-grant categories is "severely undercut" by her statement in the email that the expenditures should be charged to ADRD for "grant accounting purposes."  (Id. at PageID 2057.)

---

out of THI's Operating Account traveled across state lines.  (ECF No. 183 at PageID 2036 ("Kimberly Townsly of Regions Bank authenticated banking records for THI . . . [and] testified that Regions Bank is headquartered in Birmingham, Alabama, and that all check and electronic transactions clear using bank servers in Birmingham.").)

Responding to Robinson's argument that the email should not be considered "material" due to its absence from the Bill of Particulars, the Government argues that an indictment need not inform Robinson "point-by-point of the manner in which the government will prove its case." (ECF No. 183 at PageID 2057; see also United States v. Bradley, 917 F.3d 493, 504 (6th Cir. 2019).) Even if the Bill of Particulars did restrict the Government's proof at trial, the Government posits that it only did so "as to the identities of the students who appear in those APRs" and not as to all counts, given the focus of the Motion for a Bill of Particulars. (ECF No. 183 at PageID 2057.)

The Court finds that sufficient evidence was presented at trial for the jury to conclude that Robinson committed wire fraud as charged in counts 11 and 12. First, Robinson's argument that she did not succeed in charging these wedding expenditures to the HRSA grant is misplaced because "[i]t is not necessary that the government prove . . . that the alleged scheme actually succeeded in defrauding anyone." (See ECF No. 160 at PageID 1411; see also Sixth Circuit Pattern Criminal Jury Instructions No. 10.02 (Mar. 21, 2021).) To satisfy this element, it does not matter if Robinson did not actually charge the wedding expenditures to the grant, as long as she participated in a scheme to do so. Indeed, the jury must find that Robinson "participated in, devised, or intended to devise a scheme to defraud." Id.

A rational trier of fact could find that Robinson was either engaged in or intended to devise a scheme to defraud when she initially paid for her wedding expenses, as well as when she communicated how to charge those expenses to her accounting team at MCG. Contrary to her assertions that the Government changed its theory mid-trial, see infra at Section II.B, the Government maintained throughout this case that Robinson used funds in THI's Operating Account that were received through the HRSA grant to pay for her wedding and communicated

15

to MCG that these expenditures should be charged to the HRSA grant.  And, based on the evidence, a jury could conclude that she was engaged in a scheme to defraud HRSA by spending grant funds in THI's Operating Account on personal expenses, specifically her wedding. Reading the Robinson-Foster email exchange in a light most favorable to the Government, Robinson expressly directs MCG to charge her wedding expenses to the HRSA grant "for grant accounting purposes."  (ECF No. 183 at PageID 2057.)  Coupled with the understanding that MCG would accept her responses and expected her full disclosure on the nature of these expenses, an inference can be made that Robinson's email response also served as proof of her intent to charge wedding expenses to grant funds.  (ECF No. 176 at PageID 1856.)

The jury was entitled to interpret the evidence presented at trial – including the second half of the Robinson-Foster email and Exhibit 94, displaying THI's expenditure classifications – as Robinson explained it or to interpret it by its plain language.  In doing so, the jury was entitled to assess the credibility of Robinson's testimony and her explanation of her email correspondence.  (See ECF No. 160 at PageID 1393, 1402 (instructing the jury to "decide whether you believe what each witness had to say, and how important that testimony was . . . You should consider those same things in evaluating the defendant's testimony.").)  The jury must use its discretion during deliberations to credit or discredit Robinson's explanation that the "ADRD" comment referred to a previous phone conversation between her and Ms. Foster, as well as her contention that she and her now-former husband reimbursed the THI Operating account with an amount close to the combined cost of the alleged wedding expenditures.

A juror could also rationally find that the alleged misrepresentation was material. Robinson urges the Court to conclude that the Robinson-Foster email lacked materiality due to its absence from the Government's Bill of Particulars.  However, Robinson neglects to

16

acknowledge that, when filing her Motion for a Bill of Particulars for the First Superseding Indictment, (ECF No. 77), she sought information regarding the allegedly inconsistent student records that the Government used to support counts 18-20.  (See United States v. Salisbury, 983 F.2d 1369, 1375 (6th Cir. 1993) ("A bill of particulars is meant to be used as a tool to minimize surprise and assist defendant in obtaining the information needed to prepare a defense and to preclude a second prosecution for the same crimes.")  The Government then filed a Bill of Particulars that was tailored to Robinson's Motion, listing the students to which the Superseding Indictment referred.  (ECF No. 92.)  Thus, the Bill of Particulars responded to specific counts of the Indictment and did not reflect information relevant to counts 11 and 12.  "[A] defendant is not entitled to a bill of particulars with respect to information which is available through other sources."  United States v. Bell, No. 17-CR-20183, 2020 WL 7382527, at *3 (E.D. Mich. Dec. 16, 2020) (quoting United States v. Paulino, 935 F.2d 739, 750 (6th Cir. 1991)).  The Indictment listed the transactions at issue in counts 11 and 12, and Robinson had access to the Robinson-Foster email through MCG's document production.  (See ECF No. 97 (Defense Subpoena Returned Executed for witness Memphis Consulting Group); see also ECF No. 183 at PageID 2052 ("[D]efendant received the emails in advance of trial via subpoena at the same time the government did").)  The Bill of Particulars specifying evidence for counts 18, 19 and 20 does not therefore eliminate Exhibit 83's materiality as it relates to counts 11 and 12.[3]

---

[3] The Government made an additional argument defending its use of the Robinson-Foster email, asserting that the text of the Indictment in paragraph 8, the focus of the Bill of Particulars, refers to misrepresentations to HRSA "and others" – and therefore could incorporate misrepresentations beyond those in the APRs.  (ECF No. 183 at PageID 2050.)  This argument is not relevant, however, as the Bill of Particulars only related to counts 18 – 20, not count 11 or 12.

Moreover, Nyaku's testimony corroborated that the Robinson-Foster email exchange would be relied on by his team for accounting purposes, and thus Robinson's descriptions of which expenditures should be charged to the HRSA grant funds were significant.  Materiality is defined as having "'a natural tendency to influence, or [being] capable of influencing, the decision of the decision making body to which it was addressed.'" United States v. Gaudin, 515 U.S. 506, 509 (1995) (quoting Kungys v. United States, 485 U.S. 759, 770 (1988) (internal quotation marks omitted)).  Reading this email correspondence alongside Nyaku's testimony about MCG's reliance on Robinson to explain expenditures, her email response would be capable of influencing Ms. Foster to charge these wedding expenses to the HRSA grant.

The Robinson-Foster email also supports the third element of wire fraud, intent.  As discussed supra, a jury could reasonably infer that Robinson intended to charge her wedding expenses to the ADRD portion of the HRSA grant, given her express statement to Ms. Foster to that effect in their correspondence.  Finally, the subsequent timing of Robinson's correspondence with Foster following her expenditures does not refute the evidence of the existence of an ongoing scheme, one in which Robinson (1) made expenditures out of THI's Operating Account and (2) then directed her accounting team to charge those same expenses to the HRSA grant.

Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have found all elements of wire fraud beyond a reasonable doubt.  Therefore, Robinson's Motion for Judgment of Acquittal is **DENIED** as to counts 11 and 12.

### B.  Counts 19 & 20

Robinson argues that the Court should grant a judgment of acquittal as to counts 19 and 20 because the Government failed to prove that Robinson engaged in a scheme to defraud HRSA by misrepresenting THI's operations in the APR submissions.  In response, the Government

argues that the same scheme and intent to defraud underlying counts 11 and 12 applies to these counts, and therefore the jury could find all elements of wire fraud here, too.  As to these counts, the Court disagrees with the Government: there is no scheme underlying counts 19 and 20 and therefore the jury could not find Robinson guilty of wire fraud.

Robinson argues that, because she was successful on her previous motion for judgment of acquittal in grant years 2017-2018 (count 3) and 2018-2019 (count 4), she could not have engaged in the scheme to defraud underlying counts 19 and 20, which were reliant on the scheme established in the earlier counts.  (ECF No. 170 at PageID 1463.)  Moreover, even if the Court were to find that a scheme related to counts 11 and 12 existed, Robinson argues that there is no continuing scheme between counts 11 and 12 and counts 19 and 20; they involve different years and different activities.  According to Robinson, there is no evidence that she improperly used THI funds for personal expenditures or made misrepresentations to HRSA in 2017-2019, unlike what was alleged for counts 11 and 12.  Thus, if a jury were evaluating the only evidence remaining to support counts 19 and 20 – the APRs themselves and related testimony about their substance and submission –a jury could not find a scheme to defraud or intent to engage in one.

Robinson also opposes the Government's use of a lulling theory to support these counts, emphasizing that a lulling theory for wire fraud still requires the existence of a scheme to defraud.  (ECF No. 170 at PageID 1464; see also United States v. Griffith, 17 F.3d 865, 874 (6th Cir. 1994).)  Without an underlying scheme, the jury could not have found that the APRs were submitted in an effort to defraud.  (Id.)  Robinson does not contend that the Government failed to establish proof of the last element of wire fraud, the use of wires affecting interstate commerce, and therefore the Court considers that element satisfied.

In response to Robinson, the Government offers a weak argument for the existence of a scheme to defraud and intent for counts 19 and 20 by relying on its earlier discussion supporting counts 11 and 12. (ECF No. 183 at PageID 2058-59 ("evidence that there was a scheme to defraud, and that the defendant had the intent to defraud, that applied directly to Counts 11 and 12 also has inferential application to these counts.") The Government then pivots to materiality, emphasizing the significance of these misrepresentations on the APRs since APR data was crucial to HRSA's ability to evaluate future funding. (Id. at PageID 2059.)

The Court agrees with Robinson. No rational juror could find that there was an underlying scheme to defraud related to counts 19 and 20. Indeed, the Government provides no evidence of inappropriate actions taken by Robinson in the years 2017-18 or 2018-19 other than submitting the APRs – and nothing to connect these counts to the scheme to defraud underlying counts 11 and 12, which occurred in different years.

Additionally, the APRs alone do not evince a scheme to defraud. First, there was no funding directly tied to these reports and thus Robinson had little incentive to manipulate their data to receive or maintain funding for THI. Further, the evidence showed that Robinson's APRs alternately inflated and deflated the numbers of her students who received HRSA scholarships, yet still provided a substantiated threshold number of students who received HRSA scholarships – signifying that her submissions were admittedly riddled with errors, but not intimating that they were made in order to receive more funding or retain funding. Finally, there is no evidence other than Robinson's final submission of the APRs that she checked the data at issue in these counts. Given this evidence, in addition to a lack of a scheme related to these counts, the Court cannot find proof of intent.

Even evaluating the evidence in the light most favorable to the Government, without evidence of all of the elements of wire fraud, Robinson's Motion for Judgment of Acquittal as to counts 19 and 20 must be **GRANTED**.

## II.   Rule 33 Motion for New Trial

A motion to vacate a judgment and grant a new trial under Rule 33 of the Federal Rules of Criminal Procedure requires a court to assume the role of a "thirteenth juror."  United States v. Lutz, 154 F.3d 581, 589 (6th Cir. 1998).  A court grants a Rule 33 motion only where the verdict was against the manifest weight of the evidence.  See United States v. Chalmers, 2012 WL 5384643, at *2 (W.D. Tenn. Nov. 1, 2012).  Rule 33 motions for new trial are "disfavored, discretionary, and granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict."  Id.  Because the Court granted Robinson's Motion for Judgment of Acquittal as to counts 19 and 20, her Motion for New Trial is only considered as to counts 11 and 12.

### A.  Motion for New Trial – Sufficiency of the Evidence

Under Rule 33, Robinson argues that the Court should grant a new trial because the weight of the evidence is against the jury's verdict on counts 11 and 12.  Incorporating her discussion of the evidence arguing for a Judgment of Acquittal, she contends that the evidence supporting these counts is "almost non-existent," consisting primarily of the first portion of the Robinson-Foster email exchange.  (ECF No. 170 at PageID 1461-62.)  Further, she argues that there is no proof of a scheme at the time of the transactions – as opposed to the time of the email exchange between Robinson and Foster – and therefore the Government could not prove intent or that the expenditures were made in furtherance of a scheme to defraud.  (Id.)

Robinson then turns to what evidence is in the record.  First, she argues that a $3,400 cash deposit in July 2016, (Trial Ex. 102), approximately just $84 less than the combined amount of both expenditures in counts 11 and 12, is "persuasive proof that these THI expenditures were reimbursed" and cuts against any allegation of intent on Robinson's part.  (ECF No. 170 at PageID 1462.)  Moreover, she points to Howell's chart of bank deposits (Trial Ex. 62) and the Regions Bank records (Trial Ex. 18, Bates 1778) to establish that THI did not receive any grant funds in its Operating Account in June – constituting "further proof that there was no scheme . . . to defraud to obtain money . . . at the time that these expenditures were made."  (ECF No. 170 at PageID 1462.)

In response, the Government argues against a new trial by also relying on its previous argument that the Robinson-Foster email establishes three of the four elements of wire fraud – participation in a scheme to defraud HRSA of grant funds provided to THI, intent to defraud, and the materiality of this representation – and that bank records establish the use of wires in interstate commerce.  (ECF No. 183 at PageID 2061.)  The Government emphasizes that, at most, Robinson offers arguments "for competing inferences from the evidence," which is "not an appropriate basis for granting a new trial" because a court does not set aside a verdict based on a reasonable jury's decision simply for an arguably more reasonable result.  (Id.; see also Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004) ("[T]he court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable").)  Without showing that Robinson's conviction on counts 11 and 12 "exceeds the bounds of reasonableness so as to constitute a miscarriage of justice," the Government contends that Robinson has not established that she is entitled to a new trial.  (ECF No. 183 at PageID 2061.)

In line with the Government's argument, here, the Court finds that the verdict as to counts 11 and 12 was not against the manifest weight of the evidence.  This is a high standard – the evidence must "preponderate[] heavily against the verdict." Chalmers, 2012 WL 5384643, at *2. When weighing the evidence in the role of the thirteenth juror, the Court cannot understate the prominent role that the Robinson-Foster email plays in demonstrating multiple elements of the wire fraud statute – indeed, to start, as strong evidence of participation in a scheme to defraud. The fact that Robinson's email exchange with Foster followed the actual expenditures makes no difference – the evidence demonstrates expenditures out of THI's Operating Account and Robinson's effort to charge those expenses to the grant, all part of an ongoing scheme in effect (1) when the transactions took place and (2) when Robinson corresponded with Foster.

Moreover, when combined with the fact that MCG was contractually expected to rely on Robinson's disclosures of the nature of expenditures, the Robinson-Foster email can reasonably be considered as a material misrepresentation and a demonstration of Robinson's intent to charge such expenditures to the HRSA grant.

The Court does not find reason to disturb the conclusion reached by the rational trier of fact as to counts 11 and 12 and does not find the verdict is against the manifest weight of the evidence.  See United States v. Paige, 470 F.3d 603, 608 (6th Cir. 2006); Chalmers, 2012 WL 5384643, at *2.

### B.  Motion for New Trial - Constructive Amendment or Prejudicial Variance

In addition to urging the Court to grant a new trial based on the sufficiency of the evidence, Robinson argues that the Government used a different scheme to convict Robinson after the Court acquitted her on counts 1-4, 5-10, and 13-17.[4]  By allegedly shifting theories

---

[4] Robinson also makes this motion for a new trial for counts 19 and 20.  Because these counts have already been dismissed, this argument need not be addressed as to those counts.

23

during the trial, Robinson argues that the Government committed either (1) a constructive amendment of the Indictment or (2) a prejudicial variance. In response, the Government contends that it maintained the same theory presented in the Second Superseding Indictment as it did during trial. (ECF No. 183 at PageID 2050.) At most, the Government contends that the introduction of the Robinson-Foster email was a variance that did not affect Robinson's substantial rights. (Id. at PageID 2051.)

For the following reasons, the Second Superseding Indictment was neither constructively amended at trial nor was it subject to a variance affecting Robinson's substantial rights. As the Parties know, the Government did offer a new theory when it argued against Robinson's Rule 29 Motion at the close of the Government's proof. (ECF Nos. 148, 150.) Because the Court pointed out that the Government was arguing a new theory that could result in a mistrial, that argument was withdrawn. However, during the trial itself, the Government did not argue for Robinson's conviction under a new scheme, and no new scheme for counts 11 and 12 was presented to the jury. Thus, Robinson is not entitled to relief on these theories. Without a new scheme presented to the jury by the Government and used to convict Robinson, the Court need not weigh the evidence presented at trial under any alleged different scheme.

## 1. Constructive Amendment

"An indictment may be the subject of an actual amendment, a constructive amendment, or a variance." United States v. Budd, 496 F.3d 517, 520 (6th Cir. 2007). "An actual amendment occurs when the prosecutor actually changes the text of the indictment." Id. Relevant here, "[a] constructive amendment 'results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of

24

an offense other than the one charged in the indictment.'" United States v. Kuehne, 547 F.3d 667, 683 (6th Cir. 2008) (quoting United States v. Martinez, 430 F.3d 317, 338 (6th Cir. 2005)). "An amendment is considered per se prejudicial," United States v. Robison, 904 F.2d 365, 369 (6th Cir. 1990), because it infringes upon a defendant's "grand jury guarantee" under the Fifth Amendment. United States v. Hynes, 467 F.3d 951, 962 (6th Cir. 2006) (quoting United States v. Chilingirian, 280 F.3d 704, 712 (6th Cir. 2002)). "A defendant who proves a constructive amendment is thus entitled to a reversal of his or her conviction." Id.

To establish a constructive amendment, a defendant must prove "that the important functions of an indictment were undermined by both the evidence presented and the jury instructions." United States v. Budd, 496 F.3d 517, 522 (6th Cir. 2007). When considering the issue, a court "review[s] the language of the indictment, the evidence presented at trial, the jury instructions and the verdict forms utilized by the jury." Bradley, 917 F.3d at 501 (quoting Keuhne, 547 F.3d at 683-84.) The defendant bears the burden of demonstrating the occurrence of a constructive amendment. Id.

Robinson argues that the Government abandoned its original theory of prosecution – that she misapplied grant funds when spending them on wedding expenditures not permitted under the grant – and instead used the Robinson-Foster email exchange to prove how Robinson made misrepresentations to her THI colleagues and misapplied non-grant THI funds. (ECF No. 186 at PageID 2069.) Consequently, she contends that the Government used a new theory and evidence not included in the Second Superseding Indictment or Bill of Particulars. (ECF No. 170 at PageID 1461.) She also states that jury instructions "were deficient" because the Government refused to describe its alleged scheme to defraud in the jury instructions as required by the Sixth Circuit. (ECF No. 186 at PageID 2070.) Thus, she urges the Court to find that a

25

constructive amendment of the Indictment allowed the jury to convict Robinson of a scheme to defraud for which she was not charged.

The Court first considers whether a constructive amendment exists by analyzing the language of the Indictment per Bradley.  The Second Superseding Indictment states that "[i]t was part of the scheme that ROBINSON would use THI funds for a large number of personal expenditures. . . includ[ing] . . . Expenses related to ROBINSON's wedding."  (ECF No. 107 at PageID 429-30.)   The only other direct mention of counts 11 and 12 in the Indictment was in a table providing the specific date, payee, amount, and description for counts 5-17, including the payments to GP Entertainment and Facegyrl.  (Id. at PageID 441-42.)  Building on the Indictment's language, the evidence presented at trial included records demonstrating that these expenditures were paid out of THI's Operating Account, testimony as to how grant funds were and were not permitted to be spent, and the email exchange in which Robinson told Ms. Foster to charge these wedding expenditures to the ADRD funds for grant accounting purposes.  Thus, the evidence did not differ from the Indictment's allegation that Robinson used HRSA grant funds contained in THI's Operating Account to pay for wedding expenses.

Further, the jury instructions also did not undermine the Indictment because they were based on the Sixth Circuit Pattern Instructions for wire fraud.  See Sixth Circuit Pattern Criminal Jury Instructions No. 10.02 (Mar. 21, 2021); see also ECF 160 at PageID 1410-13.  The Pattern Instructions provide the following for the first element of wire fraud: "(A) First, that the Defendant [knowingly participated in] [devised] [intended to devise] a scheme to defraud in order to deprive another of money or property, that is ___ [describe scheme from indictment]."  See Pattern Instructions, No. 10.02(1)(A)(original emphasis included).  The Court instructed the jury on the first element as follows: "(A) First, that the defendant knowingly participated in,

devised, or intended to devise a scheme to defraud in order to deprive another of money or property[.]" (ECF No. 160 at PageID 1410.) The Use Note for the instruction states that "Brackets," such as the ones indicated above to describe the scheme from the Indictment, "indicate options for the court. Brackets with italics are notes to the court." Pattern Instructions, 10.02 Use Note. Contrary to Robinsons' assertion that the description was therefore "required" to be included, (see ECF No. 170 at PageID 2070), the description was optional. Moreover, as the Court also re-read the Indictment to the jury as part of its instructions, the jury was sufficiently aware of the scheme to defraud that they were to consider. Finally, the verdict forms used by the jury stated that the jury found its verdict "on the charge in the indictment." (ECF No. 163.)

Thus, no constructive amendment can be found because neither the evidence presented nor the jury instructions undermined the functions of the Second Superseding Indictment – to allow the jury to determine whether Robinson satisfied all of the elements of wire fraud, including a scheme to defraud HRSA by way of directing her accountants to charge wedding expenses to the ADRD portion of the grant, after paying for those expenses out of funds held in THI's Operating Account. The Court therefore turns to whether a material variance existed.

2.   Material Variance

"Variances differ from constructive amendments. They 'occur[ ] when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" Bradley, 917 F.3d at 502 (quoting United States v. Prince, 214 F.3d 740, 756-57 (6th Cir. 2000)) (brackets in Bradley). "[A] defendant who establishes only a variance has occurred must further demonstrate that his or her substantial rights have been affected." United States v. Hynes, 467 F.3d 951, 962 (6th Cir. 2006). "In this context,

[s]ubstantial rights are affected only when a defendant shows prejudice to [her] ability to defend [her]self at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." Id. (quoting United States v. Barrow, 118 F.3d 482,488-89 (6th Cir. 1997)) (internal quotation marks omitted).  A prejudicial variance requires reversal of the conviction.  United States v. Bradley, 917 F.3d 493, 502 (6th Cir. 2019).

Robinson argues that if the Court finds that the Government committed a variance, she is entitled to a new trial because she suffered in the following ways:

- the Robinson-Foster email was never produced or bates-stamped by the Government, and Robinson only received it from MCG along with thousands of other pages. Thus, she did not have notice that the email would serve as the only misrepresentation for counts 11 and 12;
- Robinson focused her defense for counts 11 and 12 on "showing that expenses were not made with grant funds, which the Government now all but concedes it was not able to prove;" and
- Had Robinson known that the Government would shift its theory of prosecution, she would have investigated or possibly called other witnesses including Phylea Foster, and may have issued subpoenas to MCG and HRSA for specific records relating to the ADRD grant.

(ECF No. 186 at PageID 2070.)

The Government concedes that the introduction of the Robinson-Foster email was "at most . . . a variance."  (ECF No. 183 at PageID 2051.)  However, it contends that this was not a prejudicial variance.  Arguing that Robinson "received the emails in advance of trial via subpoena at the same time the government did," that she had the opportunity to cross-examine Mr. Nyaku about the emails, and that she also provided "her version of the exchange" to the jury through her testimony, the Government denies that she suffered prejudice.  (Id. at PageID 2052.)

Because the Government effectively concedes that a variance did occur with its introduction of and reliance on the Robinson-Foster email, the Court moves directly to whether this was a prejudicial variance.  While this is not a simple evaluation, Robinson did have advance notice of the email exchange from MCG's production of documents to both Parties, had the

opportunity to cross-examine Mr. Nyaku about it, and had the chance to testify to its contents herself.  Moreover, trial strategy always involves decisions about investigating, issuing subpoenas to, or calling certain witnesses to testify before the jury.  MCG was critically involved in Robinson's accounting decisions from the beginning, and, as the manager charged with processing THI's transactions, Ms. Foster was a reasonable witness for both sides to consider from the outset.  A trial strategy decision made one way cannot later serve as establishing a defendant's lack of ability to defend herself at trial, or as a challenge to the trial's general fairness.  Further, the Indictment as to counts 11 and 12 remains sufficient in its breadth and depth to bar any subsequent prosecutions as to Robinson's conduct.  Accordingly, the Court does not find that a prejudicial variance existed.  The Court therefore **DENIES** Robinson's Motion for a New Trial.

## CONCLUSION

Because Robinson has established that she is entitled to Judgment of Acquittal on counts 19 and 20, her Motion is **GRANTED** as to those counts.  Because Robinson has not established that she is entitled to acquittal or a new trial on counts 11 and 12, her Motion is **DENIED** as to those counts.

**IT IS SO ORDERED,** this 6th day of January, 2022.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE