**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                  No. 2:20-CR-20148-SHL-tmp

KATRINA ROBINSON

     Defendant.

## DEFENDANT'S RENEWED POSITION WITH RESPECT TO SENTENCING

Katrina Robinson, by and through her counsel, respectfully submits this position statement regarding sentencing and the Revised Presentence Investigation Report (Revised PSR), ECF 212, in this matter:

## CERTIFICATE OF CONSULTATION

Undersigned counsel certifies that he has conferred with counsel for the Government and the U.S. Probation Office in a good faith effort to resolve any disputed matters.

## PROOF AT SENTENCING

Despite Ms. Robinson's acquittal on Counts 19 and 20, the Government continues to urge that Ms. Robinson allegedly defrauded sixty-four (64) The Healthcare Institute, Inc. (THI) students based on an uncharged theory of a crime, for which Ms. Robinson has now been acquitted. Unfortunately and at great expense to her, Ms. Robinson will now need to call approximately 70 witnesses at sentencing and expects it to last a full day or more.  Ms. Robinson intends to call all 64 alleged victim-students to prove that she did not defraud any students.  Ms. Robinson has previously noted that the Government refuses to provide her with the names of these alleged

victim-students, and the Government still has not provided those names.  Unless the Government reverses its position or the Court determines, prior to sentencing, that these allegations are not properly before the Court, Ms. Robinson will likely need to continue the sentencing hearing.  As of February 4, 2022, at 12:30 p.m., the probation office also has not received this information.

<u>**OBJECTION TO UNCHARGED, UNPROVEN, AND ACQUITTED CONDUCT**</u>

Ms. Robinson has general objections to the inclusion of uncharged, unproven, and acquitted conduct throughout the revised PSR.  In her initial Position with Respect to Sentencing, ECF 201, Ms. Robinson noted numerous objections to the inclusion of uncharged, unproven, and acquitted conduct.  After these objections, which were conveyed directly to the Government and to the probation officer and then later filed with the Court, the Court then acquitted Ms. Robinson on Counts 19 and 20.  Order Denying Defendant's Motion for Judgment of Acquittal as to Counts 11 and 12; Granting Defendant's Motion for Judgment of Acquittal as to Counts 19 and 20; and Denying Defendant's Motion for New Trial, ECF 206 (hereinafter "Order Granting JOA as to Counts 19 and 20").  Notably, in the Court's Order Granting JOA as to Counts 19 and 20, the Court wrote:

> **[T]he Government offers a weak** argument for the existence of a scheme to defraud and intent for counts 19 and 20 by relying on its earlier discussion supporting counts 11 and 12. . . .
>
> **[T]he Government provides no evidence of inappropriate actions taken by Robinson in the years 2017-18 or 2018-19 other than submitting the APRs – and nothing to connect these counts to the scheme to defraud underlying counts 11 and 12, which occurred in different years.**
>
> Additionally, the APRs alone do not evince a scheme to defraud.  First, **there was no funding directly tied to these reports and thus Robinson had little incentive to manipulate their data to receive or maintain funding for THI.**  Further, the evidence showed that Robinson's APRs alternatively inflated and deflated the numbers of her students who received HRSA scholarships – signifying that her submissions were admittedly riddled with errors, but not intimating that they were made in order to receive more funding or retain funding.  Finally, **there is no**

2

> **evidence other than Robinson's final submission of the APRs that she checked the data at issue in these counts.**

*Id.* at 20 (emphasis added).

Based on the Court's prior finding and the Government's complete lack of proof to connect Counts 19 and 20 to Counts 11 and 12, the inclusion of conduct related to Counts 19 and 20 is clearly improper under the sentencing guidelines. While the Court is allowed to consider "relevant conduct" that is "part of the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G § 1B1.3(a)(2), the Court has already ruled that Counts 19 and 20 were not part of a course of conduct or common scheme, as the Court previously found that "the Government provides no evidence of inappropriate actions taken by Robinson in the years 2017-18 or 2018-19 other than submitting the APRs – and nothing to connect these counts to the scheme to defraud underlying counts 11 and 12, which occurred in different years." Order Granting JOA as to Counts 19 and 20 at 20.

Similarly, under Sixth Circuit precedent, the Government's arguments to include this conduct also fail. "To qualify as part of a 'common scheme or plan' under the 'relevant conduct' guideline, the offenses 'must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*.'" *United States v. Hill*, 79 F.3d 1477, 1481 (6th Cir. 1996) (quoting U.S.S.G. § 1B1.3, application note 9(B)). Similarly, "[t]he three factors relevant to determining whether offenses are sufficiently related to constitute the 'same course of conduct' include 'the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* at 1481-82 (quoting same). When one of these factors is not present, the other factors must have a "stronger presence." *Id.*

None of the factors are present here that would allow the Court to consider the alleged Count 19 and 20 conduct at sentencing.  Here, the Court's prior analysis, which is quoted above, shows that there is not a common purpose nor similarity in the offenses.  Likewise, the Court also noted the gap in time between the two offenses.  In *United States v. Moored*, one of the few cases involving fraud and relevant conduct in the Sixth Circuit, the Court overturned the district court's decision to consider relevant conduct.  997 F.2d 139, 144 (6th Cir. 1993).  Even though the alleged relevant conduct and offense conduct were only four months apart, the Court found, "The connection between the events is simply too tenuous for the district court to have properly included the potential loss to the college in the computation of the total loss.  As did the [United States v.] *Kappes*[, 936 F.2d 227 (6th Cir. 1991)], panel, we find that the district court's reasoning impermissibly stretches the imagination."  997 F.2d at 144.  Here, the alleged conduct is approximately two and then three years after the offense conduct that occurred in July and August 2016.

Meanwhile, the Revised PSR acknowledges that there are different alleged victims: arguing that THI and/or HRSA were the victim(s) under Counts 11 and 12 while the victims under Counts 19 and 20 are 64 students.[1]  As such, none of the factors counsel considering the alleged conduct related to Counts 19 and 20.

Finally, Ms. Robinson would raise the inherent due process issues that come with considering uncharged, unproven, and acquitted conduct.  *United States v. Bell*, 808 F.3d 926, 927-32 (D.C. Cir. 2015) (Judges Kavanaugh and Millet concurring); *United States v. Brown*, 892 F.3d 385, 408-416 (D.C. Cir. 2018) (Judge Millett concurring and Judge Kavanaugh dissenting); *United*

---

[1] Ms. Robinson would note that this theory of victim-students was neither charged nor proven by the Government.

*States v. Jones*, 815 F. App'x 870, 883-86 (Judge Moore concurring in part and dissenting in part) (citing Judge Kavanaugh's concurrence in *Bell*).

## SPECIFIC OBJECTIONS TO THE REVISED PSR

As noted above, the Revised PSR includes information that was neither presented in the Second Superseding Indictment nor at trial. Meanwhile, the Revised PSR also includes allegations and facts, which the Government so completely failed to prove at trial that the Court granted Judgment of Acquittal on 17 of the 20 Counts contained in the Second Superseding Indictment. As a result, Ms. Robinson has objections to ¶¶ 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 24, 25, 29, 30, 31, 34, 35, 38, 44, 62, 72, 77, and 82. Ms. Robinson also objects to the recommendation and justification.

**Paragraph 12**-

Ms. Robinson objects to Paragraph 12, as the allegations are irrelevant, misleading, and incomplete. First, the allegations in Paragraph 12 are not relevant, as the Government was completely unable to prove that Ms. Robinson ever spent any Health Resources and Services Administration (HRSA) grant funds in violation of any grant terms. Specifically, after the Government closed its proof, the Court granted Judgment of Acquittal on this very point:

> As to Counts 1 through 4, 5 through 10, and 13 through 17, the Government's original theory was that Ms. Robinson used HRSA funds to pay for personal expenses, and that was the basis for all those counts. I find that the evidence was not sufficient based on that theory for two reasons really.

(**Exhibit A**, Transcript from September 27, 2021, at 4.) First, the Court explained that the Government's theory literally and figuratively did not add up, as the FBI forensic accountant's testimony and explanation "[did]n't work." (*Id.* at 5.) Next, the Court explained that the evidence actually showed the opposite of what the Government alleged (and continues to allege through the Revised PSR): "Second, the daily cash disbursements that ended up coming in under Nyaku's

5

testimony, actually on his cross, shows that at least as to initial journal entries, those alleged personal expenses were not charged to HRSA."  (*Id.* at 5-6.)

With respect to Counts 11 and 12, which were notably excluded from the Court's rulings quoted above, the Government, in their *Response of the United States to Defendant's Consolidated Motion for Judgment of Acquittal and Motion for New Trial* ("*Response to Motion for Judgment of Acquittal*"), ECF 183, all but admits that it could not actually prove that Ms. Robinson charged those wedding expenses to the HRSA[2] grant.  The Government wrote, even if the jury found that no grant funding had actually been used, the jury "could still convict [Ms. Robinson] of wire fraud because the statute requires only that a scheme to defraud exist, not that it was successful." (Response to Motion for Judgment of Acquittal, ECF 183, at 24.)  The Court noted the same in denying Ms. Robinson's Motion for Judgment of Acquittal on Counts 11 and 12:  "[I]t does not matter if Robinson did not actually charge the wedding expenditures to the grant, as long as she participated in a scheme to do so."  Order Granting JOA as to Counts 19 and 20 at 15.  As the Government did not and cannot prove that Ms. Robinson actually charged any expenses to the grant in violation of the grant terms, the allegations in Paragraph 12 are not relevant and should not be included in the PSR.

Additionally, the allegations in Paragraph 12 are misleading and incomplete, specifically the allegations in the second bullet point regarding budget revisions.  First, a review of the Notices of Award (NOAs) that were provided to Ms. Robinson and THI by HRSA show that the second bullet point is not accurate.  (Attached as collective **Exhibit B**, the various Notices of Award from HRSA, which were Trial Exhibit 2, Bates Nos. 8527 to 8555.)  The NOAs provide that only significant budget revisions require prior approval:

---

[2] Part of the money that HRSA awarded was through the Alzheimer's Disease and Related Dementias grant program, so there are references to an "ADRD" grant in the Government's *Response to Motion for Judgment of Acquittal*.

> HRSA requires grantees to seek prior approval for significant rebudgeting of project costs. Significant rebudgeting occurs when, under a grant where the Federal share exceeds $100,000, cumulative transfers among direct cost budget categories for the current budget period exceed 25 percent of the total approved budget (inclusive of direct and indirect costs and Federal funds and required matching or cost sharing) for that budget period or $250,000, whichever is less. For example, under a grant in which the Federal share for a budget period is $200,000, if the total approved budget is $300,000, cumulative changes within that budget period exceeding $75,000 would require prior approval).

(**Exhibit B** at Bates No. 8530; *see also* **Exhibit B** at Bates Nos. 8540-41 and 8546-47.)  As such, the NOAs by their plain terms clearly show that not all budget amendments require written, prior approval.

Meanwhile, the Government's grant budget expert Bruce Holmes agreed that not at all budget revisions had to be submitted for prior approval:

> In context of what you're saying there, this is also in alignment with -- if you'll take a look the other exhibit on the terms and conditions of the award, and I believe that you're referring to, A, changes that can made, which are 25 percent or $250,000 of the toral approved funds, whichever is less.  And if it's above that amount, if the grant is under -- which also specified within this, if it's under expended authority, **they may do so.  Otherwise, HRSA has to be notified.**

(**Exhibit C**, Transcript of Testimony of Nina Tumosa and Bruce Holmes, at 208-209 (emphasis added).)  As such, even the grant budget expert agreed that some changes could be made without prior approval.  Meanwhile, Mr. Holmes also testified about the Health and Human Services (HHS) grant policy statement, which clearly states, "In general, recipients are allowed a certain degree of latitude to rebudget within and between budget categories to meet unanticipated needs and to make over other types of post-award changes."  (*Id.* at 208.)

Accordingly, to the extent that Paragraph 12 has any relevance, it should be stricken or edited to correct the misleading nature of the second bullet point regarding budget revisions to conform to the evidence and testimony.

**Paragraph 13-**

7

Ms. Robinson objects to Paragraph 13 as it includes information that is not relevant conduct.  To the extent that the purchase of the Louis Vuitton handbag was included in the charges from the Government, it was included in the PayPal charges listed in Count 1.  As with many of the Government's allegations, the Court granted Judgment of Acquittal on this Count, *see supra* at 5-7, *see also* **Exhibit A** at 4-6.  Additionally, to the extent the Government now argues that these charges were simply made with THI funds (as opposed to HRSA grant funds), the Court also granted Judgment of Acquittal on that theory:  "The new theory is that Ms. Robinson paid for personal expenses with THI money, thus misapplying THI funds.  Under this theory the evidence is also not sufficient."  (**Exhibit A** at 6.)  The Court also noted that the Government had shifted its theory and was arguing something new, which would have resulted in a mistrial:

> So with that I conclude that there's not sufficient evidence to support theory number two.  I want to add though that this change in theory, to the extent someone after me finds that there was sufficient evidence, that changing the theory at this point in the trial would likely result in a mistrial.  That this change is a significant change. The Government has spent the entire trial trying to show that personal expenses were incurred as compared to what's allowed under the HRSA grant.  And to now change that to say personal expenses were incurred that should not have been paid for by THI is a complete shift in the emphasis, the content of what the evidence would be.

(*Id.* at 10.)  As the Government failed to connect the allegation in Paragraph 13 to anything that survived Judgment of Acquittal or is properly considered relevant conduct under U.S.S.G. § 1B1.3, *see supra* at 2-4, it should be stricken from the PSR, and the Court should not consider this alleged conduct.

**Paragraph 14-16-**

As with the preceding paragraphs, Paragraphs 14 through 16 contain incorrect, incomplete, and irrelevant allegations.  First, Paragraph 14 incorrectly alleges a "pervasive pattern of misuse of THI funds."  Paragraphs 15 and 16 then seem to expound on that alleged "pervasive pattern."

First, the Court clearly found that the Government had completely failed to prove that any of the alleged expenses (except possibly the two wedding expenses in Counts 11 and 12) had been made with federal grant funds, *supra* at 5-7; *see also* **Exhibit A** at 4-6, and, thus, any reference to what was approved or allowed by HRSA in these Paragraphs is not relevant.  Meanwhile, the Court also noted that THI's accountant testified that Ms. Robinson, as the sole owner of THI, was allowed to make personal purchases with THI funds:  "Nyaku said several times if there were personal expenses, those could be paid for with private money, they could be paid for with so-called profits."  (**Exhibit A** at 7.)

Even if we consider the Government's new theory that these were simply misused THI funds, the theory falls apart when looking at the actual expenses, many of which are listed in Paragraphs 15 and 16.  For instance, even looking at the Government's potential theory related to a misuse of THI funds, the Court found that expenses related to Celebrity Body Studios, which is listed in Paragraph 15 of the PSR, would have been proper:

> "[S]ome of the Government's focus was on the creation of the Celebrity Body Studios.  So – which was discussed with the accountant and seemed to, you know, be revealed that the company was starting this other business.  So none of that would be personal expenses that would somehow constitute a 666 problem, wouldn't it?

(**Exhibit D**, Transcript of proceedings on September 24, 2021, at 17.)  The Court said the same about some of the other personal expenses, including the purchase of Grizzlies tickets, purchases at Lowe's, and purchases at Home Depot.  (*Id.* at 17, 26.)  The Court also found that the salary payments, IRA contributions, and performance payout, listed in Paragraphs 15 and 16 of the Revised PSR, would not survive under the Government's theory that this was simply a misapplication of THI funds, as obviously salary, retirement benefits, and performance payouts are proper for a business owner and employee.  (*Id.* at 37-40 (Court concluded that Counts 6, 7,

and 8 would go away under the Government's theory based on a misuse of THI funds.).)  As such, all of Paragraph 14 and Paragraph 15 should be removed from the Revised PSR.

Meanwhile, much of Paragraph 16 should also be removed for the same reasons. Additionally, in Paragraph 16, the PSR incorrectly asserts that there was an indiscriminate comingling of THI funds and HRSA funds.  First, federal regulations are clear that HRSA and HHS cannot require a separate account for grant funds and HRSA allows the comingling funds into a single operating account:  "The HHS awarding agency and pass-through entity must **not** require separate depository accounts for funds provided to a non-Federal entity."  45 C.F.R. § 75.305(b)(7) (emphasis added).  Meanwhile, the Court found that all alleged expenditures (except those possibly included in Counts 11 and 12) were properly accounted for by Mr. Nyaku into non-grant accounting categories.  (**Exhibit A** at 5-6.)

As such, Paragraphs 14, 15, and 16 should be completely removed from the Revised PSR.

**<u>Paragraph 17-</u>**

Ms. Robinson objects to Paragraph 17, as it also has significant problems.  First, Paragraph 17 incorrectly states that the APRs and student records show fraudulent wire transfers related to the wedding expenditures.  In reality, these expenditures had nothing to do with the student records or the APRs.  Additionally, the Revised PSR fails to identify why these transfers were fraudulent. This is troubling because Ms. Robinson is still left guessing as to the Government's theory about whether these expenditures were made with HRSA grant funds or simply THI funds.  This is important, as it could affect who Ms. Robinson would need to make restitution to for these expenditures: will she need to pay restitution to herself or her own company, of which she is the sole shareholder?  Additionally, the Government has argued that it doesn't even know if these expenditures were misapplied:  The jury "could still convict [Ms. Robinson] of wire fraud because

10

the statute requires only that a scheme to defraud exist, not that it was successful." Response to Motion for Judgment of Acquittal, ECF 183, at 24; *see also* Order Granting JOA as to Counts 19 and 20 at 15. As such, the Government cannot even show that there was an actual $3,484.06 loss to anyone in this case.

## Paragraph 18-

Ms. Robinson objects to Paragraph 18, as Paragraph 18 is the beginning of a series of allegations in the PSR that are completely unhinged from the Second Superseding Indictment and proof at trial. First, Ms. Robinson would note that both parties agree there is a mistake at the beginning of the Paragraph: no bank records show what is alleged in Paragraph 18. (**Exhibit E**, email between Counsel for Defendant and Counsel for the Government from December 7, 2021 ("Paragraph 1[8] is in error when it asserts that the source of the information is bank records.").)[3] That, however, is only the beginning of the issues with Paragraph 18, as the Government cannot and did not prove what is alleged.

First, Ms. Robinson would note her objection to the inclusion of any conduct related to Counts 19 and 20. *See supra* at 2-4.

On top of that general objection, Ms. Robinson also has several substantive objections to the allegations as well. For example, the Government did not allege that any students were victims in this case. *See generally* Second Superseding Indictment, ECF 108. Instead, the Government alleged that Ms. Robinson had defrauded HRSA, not students. *Id.* Meanwhile, the loss amount alleged in the PSR does not appear in the Second Superseding Indictment or anywhere in the proof from trial. *Id.*

---

[3] This paragraph used to be Paragraph 17 in the original PSR, which is why there is a discrepancy in the numbering in the emails with the Government.

Of course, the evidence cannot show that any students were victims. These allegations are based upon Counts 19 and 20, but those counts and the proof thereon does not show what is alleged in the PSR. First, everyone agrees that the APRs are not directly tied to funding, including the Court. Order Granting JOA as to Counts 19 and 20 ("[T]here was no funding directly tied to these reports and thus Robinson had little incentive to manipulate their data to receive or maintain funding for THI.")

The Court's finding is consistent with the testimony at trial. Special Agent Richard Haines, an agent with HHS OIG who is the only Government witness who offered proof on the content of the APRs, testified that the APRs are submitted **after** money has been disbursed for the year and **after** money has been awarded for the next year:

> Q: I want to talk about the timing of these annual performance reports. Now, they're submitted after the fiscal year that they're about, right?
> A: Yes.
> Q: And so at that point, all of the funding has already been received by the grantee when they submit this report, right?
> A: That is correct.
> Q: So, there is no direct tie of funding with this annual performance report, right?
> A: No. This report does not affect their funding at that stage.
> Q: And that's true for the year as well because these annual performance reports are actually submitted after the money has already been awarded for the next year?
> A: Yes, I believe that's correct.

(**Exhibit F**, Transcript of the Testimony of Richard Haines, at 15-16.) Additionally, Haines testified that he did not actually look at any of THI's financial documentation to determine who was and was not funded by HRSA. (*Id.* at 15.) Instead, he simply compared the APR information to the information that he found in student files.

Next, the NOAs show how much money THI was awarded for HRSA scholarships each year, and Agent Haines testified that Katrina Robinson had proper scholarship paperwork for more students than she was given money, which means she actually awarded scholarships even though

she was not compensated by HRSA for them.  Each year, Ms. Robinson was awarded grant funds

for a certain number of scholarships, as applicable to Counts 19 and 20:

|  | Count 19 APR (FY 2017-2018) | Count 20 APR (FY 2018-2019) |
|---|---|---|
| Amount for Scholarships in Notice of Award (NOA) from June 2017 (**Exhibit B**, Bates 8544) | $90,521.00 | N/A |
| Amount for Scholarships in Notice of Award (NOA) from February 2018 (**Exhibit B**, Bates 8552) | $90,521.00 | N/A |
| Amount for Scholarships in Notice of Award (NOA) from June 2018 (**Exhibit B**, Bates 8533) | N/A | $90,521.00 |
| Amount for Scholarships in Notice of Award (NOA) from September 2018 (**Exhibit B**, Bates 8554) | N/A | $90,521.00 |

As the Revised PSR notes, each scholarship was worth $900, thus Ms. Robinson only received

100 scholarships for both 2017-2018 and 2018-2019, no matter which NOA is applicable.

This 100 scholarships number is vitally important, as Agent Haines testified that Katrina

Robinson had the proper paperwork for 100 scholarships students each year and thus met her grant

goals in both years covered by Counts 19 and 20.  When asked if Katrina Robinson was given

funding for 100 students in 2017-2018, Agent Haines agreed.  (**Exhibit F** at 22.)  He then testified

that he found HRSA scholarship paperwork for 161 students in fiscal year 2017-2018.  (*Id.*)  As

such, in 2017-2018, THI actually exceeded its goal of educating students using HRSA funds; thus,

THI did not (and the Government definitely did not prove it) receive money for students that did

not actually receive HRSA scholarships.  To the extent there was any issue with the APRs, the

issue certainly did not correlate to THI receiving HRSA scholarship money for students that were entitled to HRSA scholarships.  As such, there can be no student victims in 2017-2018.

The same is true for 2018-2019.  Agent Haines testified that no matter what NOA is applicable, THI only received HRSA scholarship funding for 100 students in 2018-2019.  (*Id.* at 25.)  Finally, Agent Haines agreed that there was no doubt in his mind that THI and Katrina Robinson had the scholarship paperwork for 100 students, (*id.*), so, again, the evidence shows that THI did not receive HRSA funds for students who did not actually receive HRSA scholarships.  As such, there are no victim-students, and the Government has failed to even show a loss to the Government based on the conduct related to Counts 19 and 20.

Even if we put those issues aside, the Government's allegation that there are 64 victim-students is directly contrary to the allegations and the proof and testimony of Richard Haines.  First, on Count 19, the Government's allegation was that the students could not be identified.  *See* Amended and Supplemented Bill of Particulars, at 4-15.  Even still, the Government tried to show that, in 2017-2018, there were not enough students with scholarship paperwork in their files to equal the number that were listed in the Count 19 APR.  Despite the fact that the Government alleged that these students could not be identified and that these students did not fill out the paperwork required for a scholarship, the Government now claims and the Revised PSR adopts the argument that there are 54 student victims who were somehow entitled to HRSA scholarships for which THI had received money in 2017-2018.  That claim is contrary to the allegations, the proof, and all logic and reason.

The same is true for Count 20 and the 10 victim-students claimed in Paragraph 18 of the Revised PSR.  Again, Agent Haines testified that the 10 students had not applied for a HRSA scholarship, and, for most, their education had been funded by a different source.  As such, these

alleged victim-students (even if we assume THI received scholarship funding for them) were not entitled to a scholarship and suffered no loss.

Accordingly, Paragraph 18 should be stricken from the PSR along with any allegation that these students were victims or suffered any loss, as it was not alleged, was not proven, and is contrary to the actual evidence in this matter.

**Paragraphs 20 and 22-**

Ms. Robinson objects to paragraph 20 and 22.  In Paragraph 20, for the reasons previously discussed, the loss amount is incorrect and should be $0.    Meanwhile, for the reasons also previously discussed, there are no student victims in this case.

**Paragraph 21 and 23**-

Ms. Robinson objects to Paragraph 21 and Paragraph 23. Ms. Robinson would first note that these paragraphs were not included in the original PSR.  For some reason, they were added after the Court acquitted Ms. Robinson on two counts.  This is especially distressing as some of the allegations relate only to the now-acquitted counts.  Furthermore, this Paragraph is not written as a recommendation or as a part of an unbiased process, but, instead, the PSR is written in such a way that the probation officer merely regurgitated the allegations of the Government: "The government submits that Robinson committed perjury . . . ."  Revised PSR, ECF 212, at 8.

Ms. Robinson did not commit perjury, and there is no evidence, here, that she did.  Under *United States v. Dunnigan*, when the Government seeks an enhancement for obstruction of justice under U.S.S.G. § 3C1.1, a court must review the evidence and make independent findings necessary to establish each of the elements of perjury, which requires a witness to give "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."   507 U.S. 87, 94-95 (1993).

15

Additionally, in the Sixth Circuit, under *Dunnigan*, sentencing courts are required to fulfill two requirements: "first, [the court] must identify those particular potions of the defendant's testimony that it considers to be perjurious, and second, it must either make specific findings for each element of perjury or at least make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Mise*, 240 F.3d 527, 531 (6th Cir. 2001) (quoting *United States v. Sassanelli*, 118 F.3d 495, 501 (6th Cir. 1997)). Thus, it is not enough for a court to simply rely on the jury's guilty verdict to trigger the obstruction enhancement for perjury. *United States v. Medina*, 992 F.2d 573, 591 (6th Cir. 1993).

Despite their burden and clear case law, the Government now seeks this enhancement based merely on the jury's verdict and with little to no proof that Ms. Robinson willfully provided false testimony. Ms. Robinson addresses each claimed instance of perjury in turn.

First, the Government, through the probation officer, argues that Ms. Robinson committed perjury when she testified that THI was growing and that she believed that it made a profit in fiscal year 2016 and 2017. First, the Court should not even consider this factual argument, as the Government's argument fails legally. U.S.S.G § 3C1.1 is clear that the "obstructive conduct" must relate to the offense of conviction. In this case, Ms. Robinson was not convicted for any conduct in fiscal year 2016-2017, and the Government has made no argument how the alleged statements relate to an offense of conviction. Alternatively, the Government's argument fails factually, as the evidence clearly shows that Ms. Robinson made a profit in fiscal year 2016-2017, as evidenced by the testimony of Jonathan Nyaku and Trial Exhibits 94 and 95. Meanwhile, in calendar year 2016, which is the year in which any alleged offense conduct occurred, the Government admits that Ms. Robinson reported a net profit of $9,021, which is consistent with her trial testimony. The 2016 tax return referenced by the Government also shows a gross profit of $524,403 for THI. Finally,

16

there is no proof that Ms. Robinson did not have profits during the month of June 2016, when the two expenditures were made.  In fact, the evidence shows that Ms. Robinson did not even deposit any grant funds into THI's operating account that month.  Trial Exhibit 62.  As such, the Court should not impose an adjustment for this testimony.

Next, the Government argues that Ms. Robinson committed perjury when she stated that she and her ex-husband made cash deposits into THI's operating account to offset wedding expenses.[4]  The Government makes no argument for how this is false and offers no testimony or evidence to show its falsity.  Instead, in direct contravention of the Court's holding in *United States v. Medina*, 992 F.2d. at 591, the Government merely asserts that the jury necessarily rejected the testimony in finding Ms. Robinson guilty on Counts 11 and 12.  Yet, the proof clearly showed that cash deposits were made around this time, *see* Trial Exhibit 102.  As such, the Court should not grant an adjustment based on this testimony.

Third, the Government argues that Ms. Robinson committed perjury when she explained that the categories listed next to expenses on Trial Exhibit 83 were non-grant categories.[5]  First, the Government completely fails to address that the evidence, specifically Trial Exhibit 94, actually shows that the categories listed were not grant categories.  Meanwhile, during his rebuttal, counsel for the Government actually admitted that it is possible that Ms. Robinson was telling the truth and that these expenses were not charged to the grant.  He specifically argued that it did not matter one way or the other, and the Court agreed, Order Granting JOA as to Counts 19 and 20 at 15; thus, the Government can hardly argue that this alleged testimony was material or false.  The

---

[4] The Revised PSR includes no information on how or why this is false.
[5] The Revised PSR merely states that "Robinson made false claims about the emails" without elaboration.  Ms. Robinson responds to the more specific allegations made by the Government in their earlier filing.

Government offered no proof as to the grant categories even though the Government had the opportunity to interview and call witnesses on this point.

The Government also takes issue with the claim that GP Entertainment was listed under a category for event package and branded giveaways because it was actually for catering, yet these two things are not contradictory. Caterers charge for events, and they often give away or include other items besides food. Consider the obvious example of koozies at a wedding for drinks. The Government offered no testimony at trial from the owner of GP Entertainment to dispute that his service included an event package and branded giveaways. As these statements were neither false nor material (according to the Government during rebuttal), the Court should not impose an enhancement for this testimony.

Finally, the Government argues that Ms. Robinson's sentence should be enhanced because she testified that she did not intentionally falsify the Annual Performance Reports (APRs). The Court has now acquitted Ms. Robinson of the counts related to this testimony. As such, not only is this not material, but the Court has also determined that this testimony was not false. *See supra* at 2-3 (quoting Order Granting JOA as to Counts 19 and 20 at 20.)

Accordingly, Ms. Robinson did not commit perjury, and it would be improper for the Court to impose an adjustment for obstruction of justice.

**Paragraph 24-**

Ms. Robinson objects to this paragraph, as the Revised PSR is critical of Ms. Robinson for proceeding to trial and concludes, on that basis, that Ms. Robinson has not accepted responsibility. In a normal case, this seems to be highly unfair way of determining acceptance of responsibility, but, in this case, it makes even less sense. Ms. Robinson was forced to go to trial, as the Government overcharged her even though it had evidence, which was eventually presented at trial

18

through the testimony of Jonathan Nyaku, showing that Ms. Robinson did not charge almost all of the alleged expenditures to the grant.  If she had "accepted responsibility" and foregone a trial, she would have been pleading guilty to many things that she simply did not do.

**Paragraph 25**-

Ms. Robinson also objects to Paragraph 25 for similar reasons.  Based on the unfounded allegations of obstruction of justice, which were discussed above, the Revised PSR suggests that Ms. Robinson has not accepted responsibility in this matter.

**Paragraph 29**-

Ms. Robinson objects to Paragraph 29.  As previously discussed herein. there should be no increase based upon the loss amount, as, there was no loss, or, at most, there is a loss amount of $3,484.06.  Under U.S.S.G. § 2B1.1(b)(1)(D), there is no increase for a loss amount under $6,500.

**Paragraph 30**-

Ms. Robinson objects to Paragraph 30.  As previously discussed, there are no student victims in this case, and, thus, there should be no increase for the number of victims under USSG § 2B1.1(b)(2).

**Paragraph 31**-

Ms. Robinson objects to Paragraph 31.  Ms. Robinson should not get an increase under USSG § 2B1.1(b)(9), as the Government did not allege nor prove any misrepresentation to a consumer.  Ms. Robinson relies on her previous arguments related to the lack of student victims, and she would further note that the Government included no alleged misrepresentations to students in the Second Superseding Indictment or the Bill of Particulars.  Finally, no alleged misrepresentation to a student is included in the PSR, and the Government did not prove any such misrepresentation at trial.  During a call on February 4, 2022, the Government noted that it agreed

(for different reasons) that this paragraph and adjustment should be removed from the Revised PSR.

**Paragraph 34-**

Ms. Robinson objects to Paragraph 34 for the reasons previously stated. Ms. Robinson did not commit perjury, and the Court therefore cannot adjust her sentence based on that allegation.

**Paragraphs 35 and 38-**

Based upon her previous objections, Ms. Robinson objects to the calculations of the adjusted and total offense levels.

**Paragraph 44-**

Paragraph 44 includes inaccurate and incomplete information. First, this paragraph claims that refund money was deposited into an account, in which it was never actually deposited. Ms. Boudreaux also did not state much of what is claimed in this paragraph. Meanwhile, the FBI, in questioning Ms. Boudreaux repeatedly threatened her with separation from her child and that they (the FBI) was only interested in "the big fish." Next, the paragraph also fails to include any information about the fact that the victim does not claim to be a victim. Specifically, Ms. Boudreaux longtime domestic partner and alleged victim Robert Sorrentino has told authorities that he was not defrauded. According to Sorrentino, he did pay for Boudreaux to attend classes at the Healthcare Institute. About two months later (the time in which she got the refund), he found out that Boudreaux asked for, and received, the refund due to her needing the money for other reasons. He states that he was fine with this and that at no time did he feel then, or now, to be a victim of any type of fraudulent activity. He provides Boudreaux financial assistance with her bills on a weekly basis, and he has given her his credit card on numerous occasions for her to be able to purchase items that she needs. In fact, he stated that he and Boudreaux have a joint credit

card in which he is responsible for making the payments.  Sorrentino also stated that Boudreaux is currently living in a house with her daughter that he pays for and is buying for Boudreaux. Sorrentino never complained to law enforcement about this matter and, in fact, paid for Ms. Boudreaux's lawyer in this matter.

Additionally, these charges were dismissed on motion by the Government on December 20, 2021.

As such, this paragraph should be removed or at least updated to include a balanced discussion of the alleged facts, as the actual facts show that this was a domestic issue between Ms. Boudreaux and Mr. Sorrentino.

**Paragraph 62**-

Ms. Robinson notes that Paragraph 62 (or somewhere else in the Revised PSR) should note that Ms. Robinson was removed from the State Senate.

**Paragraphs 72, 77, and 82-**

Based on her previous objections, Ms. Robinson also objects to the guideline range in Paragraph 69, the Zone in Paragraph 77, and claim in Paragraph 82 that Ms. Robinson owes restitution to any students or HRSA.

**Recommendation/Justification**-

For the reasons previously discussed, Ms. Robinson objects to the recommended sentence and restitution.  Additionally, Ms. Robinson objects to the entire first paragraph of the justification, which includes unalleged, unproven, and ultimately acquitted allegations.

## **OVERALL OBJECTION TO THE REVISED PSR**

On February 4, 2022, counsel for Ms. Robinson met with the probation office via zoom to discuss her various objections to the Initial and Revised PSRs.  Based on this conversation and the

content of the Revised PSR, Ms. Robinson would like to make a general objection to the entire

Revised PSR.   Under Rule 32, a probation officer is required to "conduct a presentence

investigation." Fed. R. Crim. P. 32(c)(1).  This obligation is also required by statute:  "A United

States probation officer shall make a presentence investigation of a defendant that is required

pursuant to the provisions of Rule 32(c)."  18 U.S.C. § 3552.  Based on the conversation and the

Revised PSR's complete disregard for the factual and legal findings of the Court, *see supra* at 2-

5, it is clear that the probation office has not done any investigation in this matter.  Instead, the

probation office in this case has simply accepted the version of events that the Government hoped

(but failed) to prove at trial.  The Revised PSR is nothing more than the Government's version of

the facts even though those facts are squarely opposite of the Court's findings.  In effect, the

Government wrote the Presentence Report in a way in which aligns with the Government's bias

and unreliable narrative in this case.

This is improper, and, as a result, the Court should not consider any of the findings in the

Revised PSR.  PSRs are given deference and weight by district and appellate courts in the federal

system.  "When a defendant fails to produce any evidence to contradict the facts set forth in the

PSR, a district court is entitled to rely on those facts when sentencing the defendant."  *United

States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007).  In this very case, the Government has already

tried to use the findings of the Revised PSR in its response to Ms. Robinson's Renewed Motion

for Return of Property:

> However, on January 26, 2022, the U.S. Probation Office issued a revised draft of the
> Presentence Report.  (ECF #212).  In that report, the amount of loss – and, by extension,
> the amount of relevant proceeds – remains unchanged from the previous version.
> . . .
>
> Here, as set out in the Presentence Report – which, applying the legal principles concerning
> the use of acquitted conduct, currently remains unchanged, even in light of the order on
> Counts 19 and 20 – there is a total loss amount in this case of $61,084.06.  By extension,

this also represents the amount of gain to the defendant, *i.e.*, the amount of criminal proceeds.

Response of the United States to Renewed Motion for Return of Property, ECF 217, at 1, 5. As the Revised PSR in this case has not been the subject of an actual investigation and the fact that PSRs are given significant weight by both appellate and district courts, Ms. Robinson respectfully requests that the Court not consider any of the findings in the Revised PSR in this matter.

### REQUEST FOR VARIANCE

Based on the sentencing factors in 18 U.S.C. § 3553(a), Ms. Robinson would respectfully request a variance to a probationary sentence if the Court ultimately finds a guideline range that would call for incarceration. "A 'variance' refers to the selection of a sentence outside of the advisory Guidelines range based upon the district court's weighing of one or more of the sentencing factors of § 3553(a)." *United States v. Grams*, 566 F.3d 683, 686-87 (6th Cir. 2009). A variance does not require "'extraordinary' circumstances to justify a sentence outside of the guidelines range." *Gall v. United States*, 552 U.S. 38, 47 (2007).

Here, the § 3553(a) factors weigh in favor of a sentence that does not include any incarceration. First, Ms. Robinson has no criminal history. She is well-educated and has maintained continuous employment throughout her adult life. She has a strong family structure, including a mother and children who supported her throughout her trial and who will continue to be involved in her life. Ms. Robinson is a public servant and has served her community as both a business owner and as a State Senator. The Government has made no allegation that Ms. Robinson abused her office or otherwise committed any crimes in her service as a State Senator. Her education, experience, and dedication justify a downward variance at sentencing.

Additionally, although Ms. Robinson was convicted for irregularities in her records, the Government admits that Ms. Robinson did much good for her community as an educator and

business owner.  Counsel for the Government said as much in his rebuttal closing argument at trial.

Meanwhile, the evidence shows that Ms. Robinson fulfilled her obligations under the federal grant

at issue.  She received funding to educate a certain number of students each year, and the evidence

showed that she far exceeded those goals each year.  *See supra* at 10-14.  The evidence also showed

that these students were low-income and often minorities.  Ms. Robinson and THI are responsible

for providing an education and life skills to these students that may otherwise not have been

available to them.  Furthermore, the evidence shows that, in doing so, Ms. Robinson was fulfilling

an important need in this community and helped staff healthcare facilities across Shelby County.

*See* Trial Exhibits 5 and 6.  Despite losing access to the HRSA grant and others, Ms. Robinson

continues to operate THI and continues to educate healthcare workers.

Meanwhile, a probationary sentence would provide just punishment and serve the purposes

of deterrence under § 3553(a).  In *Gall*, the Supreme Court noted that probationary sentences are

serious:  "Offenders on probation are nonetheless subject to several standard conditions that

substantially restrict their liberty."  *Gall v. United States*, 552 U.S. 38, 48-49 (2007).  Here, not

only will Ms. Robinson face those standard conditions, but she will also face very serious collateral

consequences regardless of the length of the sentence imposed.  She has lost her State Senate seat,

and she will also likely lose her license to practice as a Registered Nurse.  These collateral

consequences will remove the ways that Ms. Robinson has supported herself for much of her life

and are already very severe.

In sum, the sentencing factors in § 3553(a) justify a downward variance to a probationary

sentence regardless of the ultimate guidelines imprisonment range.

Respectfully submitted:

s/L. Mathew Jehl
Lawrence J. Laurenzi (TN #9529)
L. Mathew Jehl (TN #38251)
Burch, Porter & Johnson, PLLC
130 North Court Avenue
Memphis, TN 38103
Tel: (901) 524-5000
Fax: (901) 524-5024
Email: llaurenzi@bpjlaw.com
Email: mjehl@bpjlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2022, I filed the foregoing through CM/ECF system, which will provide electronic service of the foregoing to the Government.

s/L. Mathew Jehl
L. Mathew Jehl